A. H. RICKER *v.* A. L. CLARK AND HOSEA WELCH, JR.

[IN CHANCERY.]

*Usury. Costs.*

The defendants, having no money of their own to loan, solely at the request of the orator, and for his benefit, borrowed money, and loaned it to him under an agreement that they were to receive the same rate of interest from him that they were compelled to pay; and, also, two per cent. for their expenses and credit, which the master found was reasonable. The orator paid according to the contract, and the defendants paid the same to their lender. *Held,*

1. That the money so paid by the orator was not usury; as the defendants acted *bona fide,* and had no intention of contracting for usurious·interest; and have not received *to their own use,* more than the legal rate.
2. But, that was usury, which was paid in excess of the legal rate, during that portion of the time when the defendants, by reasonable diligence, could have borrowed the money for six per cent.
3. That which was paid in excess of the legal rate on the *old* debt due from the orator to the defendants was usury.
4. The general rule is, that the Supreme Court will not reverse the order of a chancellor upon the question of costs.

HEARD on bill, answer, traverse and master's report, at the June Term, 1881, Caledonia County. Ross, Chancellor, decreed that there was due from the orator on the first mortgage, $4,972.33.

The defendants appealed.

The master found substantially as follows :

In the fall of 1870, said A. H. Ricker was greatly embarrassed in his financial affairs. He was then administrator of his father's estate, and that estate was required to be settled and liabilities paid off. A mortgage was resting upon the mill property which said Ricker was anxious to pay off so that he could raise money upon said property for his immediate necessities in a larger amount than was then on said mill property. Said Ricker was then owing said Welch and Clark, defendants in the cross-bill, in their individual capacity to quite a large amount, which will be more particularly hereinafter stated. Clark was also surety on Ricker's administration bond on his father's estate. Ricker was owing other debts to quite a large amount, and not being able himself to raise the money required to meet his necessities, he applied to Welch, some time in the fall of 1870, to go about the vicinity and neighboring towns to money lenders and assist him in raising the money required.

To this end Welch made a journey to Peacham, and saw several parties there to see if the money could be obtained. They declined to furnish the money. They did not want to take the security offered.

Said Ricker came to the defendant's place in a week or two thereafter and inquired of said Welch what success he had had in raising the money. Welch then told him that he had not had any. Ricker then told Welch that he wanted be should look further ; whereupon Welch went to Barnet to see a man there for the money, but was unsuccessful. He then went to Cabot and saw three parties there for the same purpose, but none of them wanted to loan the money on such property as was offered as security. Some time in December of that year, said Ricker again met Welch and inquired what success he had had in raising the money. To which Welch replied, " Not any, yet." Welch then told said Ricker that parties did not want to loan the money on that security. Ricker then wanted Welch to look around more, and said he would pay Welch for his trouble. After this, Welch pursued his investigations further. He went to see parties in Bradford and Newbury, but had no success in raising the money. Ricker's instructions to Welch were to get the money as low as he could, but to pay 10 per cent. interest for the money if he could not get it for less than that. Nothing of any amount was done by Welch after this till some time in March, 1871, when said Ricker went to Welch and wanted he should get Clark to take hold with him (Welch) and help raise the money. At this time Welch told Ricker that he had run around considerable and paid

out a good deal, and did not know as he wanted to do more till he had pay for what he had done, and then informed Ricker what he had done. Ricker then told Welch that he would pay him well for his time. Ricker wanted to know if Welch would take hold with Clark and raise the money, and said he would pay them well for their trouble if they would get it for him, and pay them all that they had to pay out. Ricker wanted Welch to go and see Clark at that time, and he did so.

After Welch had had an interview with Clark, who was inclined to do nothing about it, Welch met Ricker in Groton village, when Ricker was anxious that Welch and Clark should raise the money, and wanted Welch should go and see Clark again. Welch then told Ricker that he could not get money short of 8 or 10 per cent.—8 per cent. at any rate. Ricker replied that he would pay them what they paid out, if it was 10 per cent. ; and pay them well for their trouble.

Ricker told Welch that he had got to have money ; that he had used some that belonged to his father's estate, and that he could not settle the estate till he had some money. He also said Clark was one of his bondsmen, and that it was for his interest to take hold and help raise the money, and that if he would do it he should lose nothing by it.

Ricker then requested Welch to go again and see Clark, and see if he could not persuade him to do it. Welch did go and saw Clark, and while there Ricker came in and talked with Clark about it, and it was then talked over among the three ; Ricker saying that he should only want the money for a year. Clark and Welch then agreed to assist him upon the terms that Ricker would pay them what interest they had to pay out on money that they borrowed for him and pay them for their trouble. It was then understood and agreed that Ricker should pay what he was owing Clark and Welch respectively, and take up all the paper they had theretofore signed with him then outstanding.

Soon after this interview Welch informed Ricker where he could get a little money, and Ricker inquired what interest he had to pay. Welch told him 8 per cent. ; to which Ricker replied that that was as well as he expected they could do. At this time it was expected that three thousand dollars would be all that would be needed to be raised, but it appearing afterwards that it was necessary to raise more money to pay off Ricker's liabilities, more was raised, as will more fully hereinafter appear.

Clark and Welch had no money of their own to loan, and whatever they furnished for Ricker they were obliged to hire.

On the 5th day of June, 1871, the money required had been

raised ; and a settlement was had between Clark and Welch of the one part, and Ricker of the other part ; and two promissory notes were then executed by Ricker to Clark and Welch as the result of that settlement ; one for $3,710, and the other for $1,451.90. . . . .

There was considerable controversy between the parties before me as to what went in to make up these two notes, and the testimony was conflicting in relation to it. No reason was given by the parties why two notes were given instead of including the indebtedness in one note. These two notes, upon their face, aggregate $5,161.92. And they seem to have been treated by the parties in making payments of interest and in computations, and as to the liability upon them as though the $5,161.92, had been included in one note. . . . .

The $3,710 note was made up of money which Welch and Clark borrowed to pay parties that Ricker was indebted to other than Welch and Clark. I find that the $1,451.92 note was made up of Ricker's indebtedness to A. L. Clark on account, $697.15 ; Hosea Welch's account, $372.99 ; Clark and Welch's services in hiring said money, $100 ; cash paid Ricker by Welch and Clark, $160 ; extra interest, 121.76 ; balance on the $3,710 note, .02 cents. The two notes were secured by mortgage.

I reject and disallow the item for extra interest, $121.76, which leaves $1,330.16, on which my computations are made. Welch's account contained $100 for his services in the fall of 1870 and winter of 1870 and 1871, in his efforts to hire the money as above stated ; and that amount was agreed upon by Welch and Ricker at the time of the settlement, June 5, 1871, and is allowed as then agreed upon by them and carried into that account.

There was put into said note of $1,451.92 the sum of $100 for Welch and Clark's services in looking up the money and doing the business prior to June 5, 1871, and this sum was agreed upon by Welch and Clark and Ricker for said services, and is allowed as agreed upon by them. . . . .

Clark and Welch were under the necessity of hiring all the money that made up the note of $3,710. And in order to get said money they were under the necessity of paying as high as 8 per cent. interest for all of said money, and in some instances they paid 8 per cent. bank interest, that is, interest in advance every four or six months ; perhaps in some instances once in three months ; but no data was given me upon which a computation of the bank interest can be made.

I find that Welch and Clark have continued to hire said money from the time of the first hiring to as late as June 5, 1878, and

that during all that time they have paid interest as above, and could not hire said money for less than eight per cent. ; but since the 5th day of June, 1878, they could have hired said money for six per cent. on good security. And I find that in any event they ought not to be allowed for advance interest upon the ground that it was not necessary to pay such advance interest for the reason that they could have hired it for eight per cent. on long time on good security, paying interest at the end of each year. And since June 5, 1878, I allow annual interest at six per cent. And the question is submitted to the court whether, upon these facts, Clark and Welch are entitled to recover eight per cent. upon the money hired by them as above stated.

I allow six per cent. annual interest on the $1,330.16 embraced in the smaller note, and disallow all claim for eight per cent. interest thereon, and do not allow anything for carrying the loan on that note.

Welch and Clark claimed that they hired money previous to June 5, 1871, on the same terms and conditions as above stated to the amount of $1,330,16 to reimburse themselves for said amount included in said small note, and that they carried it as they did the money on the large note ; and I find the fact to be as claimed by them ; but I have disallowed all above six per cent. upon this small note, upon the ground that the law will not sustain such a claim, as I understand it.

I find that Ricker agreed to pay the 8 per cent. interest, and 2 per cent. for Welch and Clark's services, use of their names and credit in carrying the whole of said loan as included in said notes. And the question is submitted to the court whether Welch and Clark are entitled to recover the eight per cent. interest, or the two per cent. in addition for their services, use of their names and credit in carrying said $1,330.16, and the two per cent. for carrying the amount in the larger note as well. I find the two per cent. upon the money loaned as above named was a reasonable compensation for carrying said loans.

A portion of the indorsements were paid in cash, and the balance went in to help make up and was included in what is called the John Buchanan notes, more particularly hereinafter named.

I have treated all the indorsements or payments on the above-named two notes as cash payments, and that portion included in the John Buchanan notes is there treated as cash, as will appear in the computation.

Ricker and Welch and Clark all agree in their testimony, as I understand it, that ten per cent. was paid each year up to June 5, 1876 ; but these payments were not all made precisely at the end

of the year when they became payable. The parties, however, adjusted the interest as though it was paid when due at the end of each year when they made settlements of the yearly interest. From the testimony, I find that all the payments of interest were made up to June 5, 1876, being five annual payments of $516.20 each, in the manner above stated.

I have computed six per cent. annual interest on the aggregate of the two notes, being $5,161.22 less the extra interest, disallowed as above named, $121.76, leaving $5,040.16 on which computation is made.

I have computed the interest for each year, and added it to the principal, and then deducted yearly the payment of $516.20 up to and including the payment of June 5, 1876, and from June 5, 1876, to June 5, 1881, six per cent. annual interest on the balance, and find the amount due by this computation, to be $4,972.33 June 5, 1881.

2d. I have also computed the $3,710 note at 8 per cent. annually from June 5, 1871, to June 5, 1878, in the manner above indicated in the computation at six per cent., applying the five payments on this note of $3,710, of the $516.20, being ten per cent. on the amount of this note, giving at the date of June 5, 1878, $3,819.59, and on this amount from June 5, 1878, to June 5, 1881, at six per cent. annually gives $728.78; aggregating, June 5, 1881, the sum of $4,548.37 on said last-named note. And computing six per cent. annual interest on the smaller note, less the extra interest of $121.76, leaving $1,330.16 on which computation is made, from June 5, 1871, to June 5, 1881, applying $145.20 of the annual payment of $516.20 up to June 5, 1876, (the $145.20 being ten per cent. on the face of the note $1,451,-92), gives the amount due on this note, June 5, 1881, to be $1,286.45, making the total indebtedness on these two notes at the last-named date, on this computation, $5,834.82.

3d. I also compute annual interest on the larger note, being $3.710, from June 5, 1871, to June 5, 1878, at ten per cent., applying the $371 annually as in the last computation, which gives, at the last-named date, the amount of $4,489.10, and at eight per cent. from the last-named date to June 5, 1881, gives the amount due on said note $5,652.68.

The smaller note, as per second computation, on the 5th day of June, 1881, amounts to $1,286.45 at six per cent. annual interest. The same last-named note computed in the same manner at eight per cent., amounts to $1,614.23 June 5, 1881. The larger note, computed at eight per cent. from its date to June 5, 1881,

in the same manner and applications as in the second computation, amounts to $4,794.17 on the 5th day of June, 1881.

*C. B. Leslie* and *H. Blodgett*, for the defendants.

Usury is defined by the courts to be a corrupt and illegal contract by which illegal interest is received, or reserved, contrary to statute ; otherwise usury does not exist. *Leslie* v. *Johnson*, 41 Barb. (N. Y.) 359 ; *Woodruff* v. *Hurson*, 32 Ib. 557 ; *Bank of U. S.* v. *Wagner et al.*, 9 Pet. 378 ; *Gregory* v. *Burley*, 9 Ark. 22 ; *Smith* v. *Beach*, 3 Day, (Conn.) 268 ; *DeForest et als.* v. *Strong*, 3 Day, (2d series Conn.) 513 ; *Farmer's Bank* v. *Burchard*, 33 Vt. 346 ; *Gleason* v. *Childs*, 52 Vt. 423.

It is also settled law that in determining the question of usury, the intention of the parties should govern without regard to the form of the contract. *Cooper* v. *Nock*, 27 Ill. 301 ; *Gale* v. *Granis*, 9 Ind. 140 ; *Daniels* v. *Mardny*, 1 R. I. 151 ; *Mitchel* v. *Napier*, 22 Texas, 120 ; *Childers* v. *Deane*, 4 Rand. (Va.) 406 ; *Jordan* v. *Mitchel*, 25 Ark. 258.

The case of *Jackson* v. *Jackson*, 51 Vt. 253, is decisive of this question. Parsons on Con. 3 p. 117, 133, 134 ; 3 Met. 211 ; 3 Gray, 225 ; 106 Mass. 413.

A contract to receive a reasonable compensation for indorsing notes for another, payable at banks, is not of itself usurious, though such contracts are liable to be perverted to usurious purposes, and are to be viewed with jealousy ; and in such cases the intent of the parties must govern. *Beckwith* v. *Windsor Manf'g. Co.*, 14 Conn. 594. A charge beyond the legal rate of interest for trouble in discounting a note or procuring money for a loan, is not usury if it is a reasonable compensation for the services rendered, or expenses incurred, at the borrower's request in connection with the loan. *Beadle* v. *Munson*, 30 Conn. 175. When a borrower agrees to pay expenses, &c., to the lender for his time and trouble for collecting and obtaining the money, and the same are incurred, it is not usury, and the same are recoverable. *Atlanta Mining Co.* v. *Georgia*, 48 Ga. 11 ; 17 Ala. 778 ; 25 N. J. Eq. 418 ; 2 Sandf. Ch. 149 ; 6 Cow. 653 ; 23 Ohio St. 298.

*J. A. & Geo. W. Wing,* for the orator.

The defendants base their claim upon the ground, that notwithstanding the form of the contract, their real position is that of a surety for the orator, and therefore they stand before this court in precisely the same situation as the plaintiff in the case of *Jackson* v. *Jackson,* 51 Vt. 253. The position of the parties, however, is easily distinguishable. Was this contract, on the facts found by the master, usurious ? An usurious contract is established, when : 1st, there is a loan, and ; 2d, when there is an agreement to pay illegal interest. 22 Barb. 118 ; 3 Har. & J. (Md.) 109 ; 52 Vt. 423. This case contains all these elements. A parol promise to pay more than lawful interest, made at the giving of a note, and to induce the creditor to take it, and which is part and parcel of it, is held usurious in, 2 Root, (Conn.) 37 ; 2 McCord, (S. C.) 369 ; 9 Cow. (N. Y.) 65. An agreement that the lender shall receive a fixed sum for trouble and anticipated loss in selling securities to raise money to be loaned, renders the loan usurious. 19 N. Y. (Sup. Ct.) 388. When a lender stipulates for a contingent benefit beyond the legal rate of interest, and has the right to demand the repayment of the principal sum, with the legal interest thereon in any event, the contract is in violation of the statute prohibiting usury, and void. 43 N. Y. 195. It is usury to agree to pay the lender the same rate of interest he has to pay a third person, when that exceeds the legal rate of interest. 3 Dev. (N. C.) Law, 43. It may be stated generally, that if the principal is actually secured, and not *bona fide* put at hazard, it amounts to a *loan,* and the taking of more than lawful interest is usury. 3 Har. & J. (Md.) 109.

It is entirely immaterial in what manner or form, or under what pretense usurious interest is taken. 9 Pet. U. S. 446 ; 3 Term, 531 ; 31 Eng. L. &. Eq. 357 ; 2 Edwd. Ch. (N. Y.) 267 ; 2 McCord Ch. 201 ; 49 Ga. 514. But in reply to these principles of well-established law, the defendants say they are not applicable to the case at bar ; that they stand in the position of a party solicited to make a loan, and who, to procure the means of so doing, must spend time and incur trouble, &c. Authority for this position may be found in the 48 Ga. 11 ; 54 Ind. 380 ; 2 Abbott (N. Y.) ;

and 30 Conn. 175. The orator does not seek here to controvert the principle of law thus established, nor to deprive the defendants of any benefit, so far as they fall within this rule of law ; and the master's report finds that the defendants have received $200 for their services in raising for the orator the money secured by the notes and mortgage in question, and which the orator concedes they are entitled to retain. But the orator insists, that when the money had been raised, and he had given his notes therefor and secured the same by mortgage upon his estate, that any parol agreement to pay more than the legal rate of interest was usurious. In determining the question of usury, the intention of the parties should govern, without reference to the form of the contract. 27 Ill. 301 ; 9 Ind. 140 ; 7 Gill & J. (Md.) 44 ; 1 R. I. 151 ; 4 Rand. (Va.) 406 ; 7 B. & C. 453 ; 13 Peters, 76 ; 1 Holt's N. P. 295 ; 8 Johns. (N. Y.) 84 ; 5 Gill & J. 23 ; 16 Md. 11.

The defendants did not guarantee the orator's paper, nor lend their credit by way of indorsing his obligations. Nor were they his sureties, nor agents ; but they were interested in, and benefited by, the usurious contract. In such a case the law disregards all pretense and sham, and deals with the reality. POLAND, Ch. J., in *Williams* v. *Wilder*, 37 Vt. 617.

The opinion of the court was delivered by

ROYCE, Ch. J. The question presented by the report is, what amount should be decreed as the sum due to the defendants upon the two notes executed by the orator on the 5th day of June, 1871. The orator claims that upon the facts found by the master there should be deducted from the amounts apparently due certain sums paid by him as usury. No claim is made that any usury is contained in the note for $3,710. It is found that the sum of $121.76 as extra interest, was included in the note for $1,451.92. Interest was paid by the orator on both of said notes at the rate of ten per cent. annually, to June 5, 1876 ; and the question is, what if any of the interest so paid shall be applied as payments on said notes ? The rule as to what constitutes usury within the prohibition of the law is comprehensively stated by Judge BARRETT

in *Farmer's Bank* v. *Burchard*, 33 Vt. p. 370, to be that : " There must be an intention, knowingly to contract for, or to take usurious interest ; for if neither party intend it, but act *bona fide* and innocently, the law will not infer a corrupt agreement. When, indeed, the contract upon its face imports usury, as by an express reservation of more than legal interest, there is no room for presumption, for the intent is apparent. But when the contract on its face is for legal interest only, then it must be proved that there was some corrupt agreement, or device, or shift to cover usury."

The notes upon their face do not require the payment of any thing beyond legal interest. Is it found as to the note for $3,710, that there was any intention to contract for the payment of usurious interest, or that there was any corrupt agreement, device or shift to cover usury ? In our judgment the facts found by the master refute any such intention or agreement. When the defendants agreed to raise the money for the orator, for which the note for $3,710 was given, it was understood that the defendants had no money to loan—and that they would be obliged to borrow it upon such security as they might be able to give ; and the orator agreed that he would pay such interest, not exceeding ten per cent. as the defendants might have to pay for the money. The defendants acted for the orator, and at his request in obtaining the money for him, and upon his assurance that he would pay them, just what they had to pay as interest, and no more, both parties then understanding that more than the legal rate would have to be paid. Upon those facts it cannot be found that there was an intention to contract for usurious interest. The claim for usury paid is based upon the hypothesis, that the party ·against whom the claim is made, has received to his own use more than the legal rate of interest which he holds against equity and good conscience. Here the money which is shown to have been paid by the orator to the defendant, was not paid for their benefit. It was paid and applied for the benefit and protection of the orator, in fulfillment and discharge of his contract. It was not held by the defendants against equity and good conscience ; for they were obliged to pay the same money or the same amounts as interest to the parties of whom they made the loan. It is found that the

defendants since the 5th of June, 1878, could have hired the money at six per cent. ; and the agreement of the orator to pay such interest as the defendants might have to pay, must be construed as requiring them to obtain the money at as low a rate of interest as they could by the use of reasonable diligence. Hence, it was their duty to have carried the loan at six per cent. after the 5th of June, 1878. And whatever was paid by the orator above that rate after that time should be applied as payment. It was evidently the expectation of the parties that the orator was to secure the defendants for the money they might procure for him. And the giving of the note and mortgage does not affect the question made as to the payment of usury. If the agreement of the parties had not any portion of it been reduced to writing, it would have stood for the same legal consideration and adjudication that it does now. It was the right of the orator to have paid the note, and thus have determined his obligation to pay interest. It was his duty to have done so, or to have notified the defendants that he should not pay the interest that he agreed to pay when the loan was made. The loan was carried by the defendants after the time at first intended, apparently for the accommodation of the orator without pecuniary benefit to them—and upon the understanding by them as evidenced by the orator's payment of interest that he intended to abide by his agreement.

It would be gross injustice to allow the orator to repudiate that agreement and permit him to recover the money so paid. The wise and beneficent laws that have been enacted to protect the borrower against the oppression and extortion of the usurer, were not designed to work out any such result. And we are not acquainted with any judicial construction that has been given to those laws that compels us to aid in any such purpose. The case of *Jackson* v. *Jackson*, 51 Vt. 253, is in principle like this ; and what is said by the judge who drew up the opinion, is as well applicable to this case as to that.

The master has found that the orator agreed to pay the defendants two per cent. per annum, upon the whole sum borrowed by them, for and during all the time they should keep said loans running, and until the orator should repay them, in addition to

the interest they should have to pay. This was to be for their time, trouble and expense, and their credit and names, and that the two per cent. so agreed to be paid, was a reasonable compensation for carrying said loans. In *Auriol et al.* v. *Thomas*, 2 Term, 52, it was held that extra charges made by the indorsers of a bill of exchange, in excess of the legal interest where there had been an agreement for their payment were not usurious, and might be allowed if they were fair and reasonable, and not a *color* for usury. See also *Lloyd* v. *Williams*, 3 Wilson, 261 ; *Hammett* v. *Zea*, 1 B. & P., 153, and *Corstairs* v. *Stein*, 4 M. & S. 192. It will be seen by reference to the authorities cited on defendants' brief, and especially the 2, 14, and 30 Conn., that that is the rule adopted by the courts in this country. So that there should have been found due to the defendants on said note on the 5th day of June, 1881, the sum of $5,652.68. The note for $1,451.92 was given for a past indebtedness of the orator to the defendants ; and the sum of $121.76 which was included therein as extra interest should be deducted ; and the balance of $1330.16, is subject to the payment of six per cent. interest annually. Any agreement for delay of payment of that note which required the payment of anything beyond legal interest would be usurious. There should have been found due to the defendants on that note on the 5th day of June, 1881, $1,286.45, making the sum of $6,939.13, which was due to the defendants on said notes on the 5th day of June, 1881. It is claimed by the defendants that the chancellor's order in relation to costs was erroneous. It appears from the report that other matters besides the ascertainment of the sum due on the above notes was referred. And we have no data from which we can judge what proportion of the costs before the master or in the Court of Chancery was incurred in the investigation of matters connected with said notes.

The general rule is, that the Supreme Court will not reverse the order of a chancellor upon the question of costs. And there is nothing here disclosed that warrants a departure from that rule.

The decree of the Court of Chancery is reversed with costs to the defendants in this court, and cause remanded, with directions

to enter a decree for defendants in accordance with mandate sent to that court.

The decree of the Court of Chancery is reversed, and cause remanded with mandate, that the sum due to the defendants from the orator on the first mortgage named in the decree, on the 5th day of June, 1881, was $6,939.13, (instead of $4,972.33,) and that the orator be permitted to redeem upon the payment of that sum, together with the other sums found due by the chancellor, with interest, and $2.25 of the master's fees, at such time as may be ordered by the Court of Chancery, and on failure to redeem the bill to be dismissed with costs, and the defendants to have judgment in the suits enjoined with costs. And if the orator shall redeem as ordered, the injunction granted against the prosecution of said suits is to be made perpetual, without costs to either party.