### HUGHES vs. GRISWOLD.

1. In its principal elements and characteristics, this case is ruled by *Merck vs. American Freehold, etc. Co.*, 79 *Ga.* 213.
2. Where the money actually lent belonged to none of the middle-men engaged in procuring the loan, that the notes and mortgage were made payable to one of them who shared in the commissions paid by the borrower, will not infect the loan with usury, the lender knowing nothing touching the payment or agreement to pay commissions, and having acted in person in contracting to make the loan, fixing the terms thereof and accepting the security, and having parted with the full amount of the loan and delivered the money to one of the middle-men engaged in procuring it.
3. In such case the fact that one of the middle-men used his own money in turning over the net proceeds of the loan to the borrower, the same being done when the lender's money was in the hands of another middle-man at a distant point, will not infect the loan with usury by reason of the commissions retained by or paid to the middle-men in pursuance of the contract of the borrower made with one of them at the time of engaging him to procure the loan. The substitution of his money in place of that of the lender was only a mode and means of exchange.
4. That one of the middle-men had advertised that he would loan

money, and that he had loaned it in other instances, would not affect this particular loan, if it was actually made, not by him, but on his application in behalf of the borrower and by an outside and independent party.

5. That after the loan was made the middle-men took part in facilitating the payment and transmission of accrued interest thereon, would not infect the loan with usury, these services being voluntary, and beneficial as well to the business of the middle-men as to both the lender and the borrower.

6. Objections to evidence, the grounds of which are not stated, are not for adjudication by the Supreme Court.

July 31, 1889.

Mortgages. Interest and usury. Contracts. Loans. Practice. Before Judge JENKINS. Wilkinson superior court. April term, 1888.

On March 7, 1887, Thos. F. Griswold sought to fore-close a mortgage on lands of H. D. Hughes. Hughes pleaded usury.

On the trial, plaintiff introduced the mortgage, with the note it was given to secure, and coupon notes for interest attached. It was dated September 1st, 1882, signed by defendant and made to Jas. H. Tallman, his heirs and assigns; and provided that if default should be made in the prompt payment of either the interest or principal note, the principal was to become due in the discretion of the holder, and it could be foreclosed at once at his option. The principal note bears even date with the mortgage, is payable to the order of Jas. H. Tallman, is due five years after date, except in case of default as stated, is for $1,000.00 with interest from date at 8 per cent. per annum, payable semi-annually on days named; both principal and interest payable at the Mechanics' Savings Bank, Hartford, Conn. The note stipulates for attorneys' fees, and the coupon interest notes, of which four were attached, themselves bear interest at 8 per cent. respectively from their maturity.

Upon the mortgage notes appears a written assignment of them by Tallman to plaintiff, without date. The mortgage bears the indorsement, "Negotiated through R. F. Lawton, Banker, Macon, Georgia."

The following oral testimony was introduced by plaintiff:

R. F. Lawton swore: I borrowed the money for defendant through Geo. W. Moore & Co., sent the application to them, and as far as I know, they got the money from Thos. N. Griswold. Geo. W. Moore, J. B. Moore and J. H. Tallman composed that firm. Drew a draft on them for the money, $1,000.00, all of which I think I paid defendant, and he paid me back $150.00 for obtaining it for him. He employed me to negotiate the loan, agreeing to pay the $150.00 for my services. Of the $150,00, I paid Moore & Co. $40.00, Jno. T. Hughes $40.00 and kept $70.00. Was engaged in that business at the time, and still am. Collected the coupons for defendant's convenience. He asked me to make remittances for him. I was acting in his interest, and collected interest principally for his convenience. Moore & Co. expected me to collect and remit interest. I made many loans for them. Jno. T. Hughes got up some applications for loans and sent to me. Have asked him to receive and forward interest. Worked principally for my own interest, and had a mutual interest with Moore & Co. and the borrower in collecting interest. Did not consider myself their agent in collecting, but have corresponded with them about it. I remit the interest to them and ask them to pay coupon notes. They sell these mortgages. May have advertised I had money to loan on realty; have advertised that I was procuring loans for people. Have had frequent transactions of this kind with Moore & Co. If I sent them a paper from any county and told them it was good and

asked them to sell it, they probably would. Had no understanding with them restricting me to particular territory. Where I do business of the kind, I have a correspondent and consider him agent of the borrower. Jno. T. Hughes was the correspondent in this case. I divide my commissions with such correspondents. I did not employ Hughes for that purpose, but take it that he employed me. My correspondents employ me. At the suggestion of others, I went to see Moore & Co. at Hartford, and told them they might be able to sell long loans, and if they would do so I would procure applications, and if they would sell them I would pay them a commission for their trouble. They said they would try it. We had no contract, but just agreed they should have a certain per cent. on all loans they negotiated for me. They did not know what commissions I charged defendant. Defendant employed me to get this loan, and I told him the application [was to be made] in Hartford. The loan was not made by Tallman, and I knew it. All loans that go through that firm are made in Tallman's name. I looked to defendant's interest in giving him notice of payments to be made. I didn't know Mr. Griswold, or where the money came from, save from what Moore & Co. told me. I told defendant when he made the contract with me what my commission would be, and don't think he demurred. I had the stationery printed and paid for it.

John T. Hughes swore : Was called on by Lawton to get up applications, and worked for the interest I had in it. Got up the loans for Lawton and the borrower, and had an agreement with Lawton for commissions. Lawton furnished the blanks, and I paid part of my commission for having an abstract of titles made. Explained the matter to defendant. He signed the contract to pay commissions and knew what they were.

James B. Moore testified substantially to the same effect with Lawton, as to the conversation and arrangements between Lawton and Moore & Co. Moore & Co. did not loan money, but were loan brokers. Had no dealings with Griswold before this loan. Griswold was a farmer with money to invest, was recommended to us by a friend, called at our office, saw this application and agreed to make the loan; and we telegraphed Lawton to close it. Griswold didn't know it was closed in Tallman's name. He paid us $1,000.00 and received no benefit from the commission; nor did he contract with us to collect the interest. Lawton remitted interest to us, and we paid it to Griswold. I don't know what commissions Lawton charged. All the loans were made in Tallman's name for convenience and to save time; and we would sell them out to our customers. Griswold paid the money to us, and we paid Lawton's draft with it, having previously deposited it in bank to our credit with our general deposit.

Two witnesses for plaintiff testified that, desiring to purchase lands covered by similar mortgages, they wrote to Moore & Co., who referred them to other parties as holders of the mortgages. Plaintiff testified substantially to the same effect with J. B. Moore as to how he came to make the loan; stated that he made it without suggestion from others, loaned $1,000.00 and received, neither directly nor indirectly, no more than the rate of interest contracted for in the note and mortgage, nor did he know that any one had received any amount from the loan, and if it were done, it was not by any arrangement with him, nor did he receive any benefit from it.

Plaintiff also introduced the application for the loan, from which it appears that it was made by defendant "through R. F. Lawton," and it contains an agreement

by defendant "to pay all expenses incurred in negotiating the . . loan, examining the premises, investigating the titles to the land, . . . and in executing all necessary papers." Accompanying the application was an "examiner's report" signed by John T. Hughes.

Defendant swore: Got from Lawton only $840.00 or $850.00, Lawton keeping the balance. Do not know who got the commissions, or where the money came from. Did not employ Lawton as my agent to get the money. Got the money at Lawton's bank and paid interest there, sometimes getting the interest notes when payment was made, and at other times Lawton would give me a receipt and afterwards send me the note. Do not consider that I received any labor or service from Lawton for this money. He was advertising to loan money on farms, and I went to him and told him I wanted some. I didn't know what his commissions were. I expected it, but didn't know what he was going to charge. Did not consider he was employed by me. He had abstract made. He told me what his interest was, and that he had to send the papers off to get the money. I did not demur to paying his commissions, but told him I thought it pretty heavy. I wouldn't get the coupons until he would forward the money. Had nothing to do with having the abstract made. Neither Tallman nor Lawton was my agent. When I made the mortgage, I thought I was getting the money from Tallman. I didn't care who it was from.

One Branan testified, for defendant, that Lawton asked witness if he would take the agency and loan some money for him in Wilkinson county. Witness declined and recommended Jno. T. Hughes. Lawton said he was making arrangements with some northern firm to get money to loan.

Defendant introduced six coupon notes, similar to those attached to the mortgage, which he had paid. Also an advertisement of " Money loaned on improved farms . . . For terms apply to R. F. Lawton," etc. Also notices from Lawton to him of interest due, which stated that it was due in Hartford, Conn., and asking that the money might be sent to Lawton in time for him to transmit it before due.

The jury found for the plaintiff the principal, with $206.66⅔ interest to April 1st, 1888, and attorneys' fees. The defendant moved for a new trial on the following grounds :

(1–3) Verdict contrary to law and evidence.

(4–9) (Assignments of error upon the admission of certain portions of the evidence, without stating what the objections thereto were.)

(10) Error in charging : " In addition to the 8 per cent., the parties may contract for such commissions as they may in good faith agree upon to cover any expenses growing out of the negotiation for the loan";—there being no evidence of such expenses.

(11) Error in charging : " But if it be in fact commissions that are charged, agreed to by the parties in good faith, and intended to cover expenses or to compensate any person engaged in the transaction for services rendered, then that would be lawful.

(12) Error in charging : " If Lawton was acting as agent for both borrower and lender, it was lawful for him to act for both."

(13) Error in charging: " If there were a contract between Lawton and defendant, and he was to pay Lawton something for his services, and Lawton employed Moore & Co. to assist in raising the money and negotiating the loan, and paid Moore & Co. a certain portion of the compensation, that would be lawful, if

v 82–20

in good faith and for the purpose of compensating them for services."

(14) Error in charging: "If a portion of the commissions was paid by Lawton to Moore & Co., that fact alone would not make the transaction illegal merely because Tallman was the payee"; it appearing that Tallman was a member of the firm of Moore & Co.

(15) Error in charging: "If the contract for commissions were made, and defendant agreed to pay them, it was his right to do so and it was the right of Moore & Co. to receive them if in good faith, as stated already."

The motion was overruled, and defendant excepted.

F. CHAMBERS and J. W. LINDSEY, for plaintiff in error.

⟩ J. H. HALL and CLIFFORD ANDERSON, contra.

BLECKLEY, Chief Justice.

1. In its principal elements and characteristics, this case is ruled by *Merck vs. American Freehold, etc. Co.*, 79 *Ga.* 213. Here, as there, the loan was procured by the joint services of three intermediaries, consisting of what might be termed a central, a rural and an urban middle-man. Here, as there, a part of the loan never in fact reached the borrower's own hands, although every cent of it passed from the lender. The amount retained by the middle-men was fifteen per cent., and this was divided amongst them in the ratio of seven to the central, and four each to the others. Here, as there, the lender had no share in these commissions, nor any knowledge that they were exacted. In that case, the contract of lending was made by an agent, the lender being a corporation. In this case, it was

made by the lender himself, the person or firm with
whom he dealt directly being the urban intermediary,
to whom was delivered by the lender the whole sum of
$1,000.   The decision in *Merck's* case being that there
was no usury, it is only necessary now to examine the
points of difference in the present case, and to deter-
mine whether any or all of them require or justify a
different adjudication of the question as to this case.

2.  The station of the urban intermediary was at Hart-
ford, Conn.    This intermediary was a partnership
(Moore & Co.) composed of several persons, of whom
Tallman was one.    He alone may be considered as the
urban intermediary, since the effect of his connection
with this case would be the same, whether his relation
to it was as an individual or as a member of the part-
nership to which he belonged.   The notes and mort-
gage were made payable to Tallman, and his firm re-
ceived part of the commissions.   In this respect the
present case is unlike *Merck's* case.   We think, how-
ever, as there was positive proof that neither Tallman
nor his firm was the lender, and also that Griswold, the
real lender, knew nothing of any compensation to the
intermediaries or of any participation by Tallman
therein, this fact is, legally speaking, immaterial ; more
especially as the jury must have found, under the charge
of the court, that what was paid to Tallman's firm was for
actual services rendered, and not by way of shift or con-
trivance to conceal or cover up usury, that question
having been submitted to them in the charge, with in-
structions that if the share of Moore & Co. in the com-
missions was not received in good faith for services, the
loan would be usurious.   This element of the charge
was probably more favorable to the borrower than he
was entitled to.   The compensation to Tallman's firm
did not proceed directly from the borrower, but came

from the central intermediary, and was the fruit of a contract which the latter had made with that firm, covering as well this loan as any others that they might be instrumental in negotiating upon applications forwarded by him. According to the decided weight of authority, had Tallman been a direct and immediate agent of the lender, his receiving for his own use and benefit commissions from the borrower without authority from or knowledge of the lender, would not infect the loan with usury. 1 Jones Mortg. §642 ; *Boardman vs. Taylor*, 66 *Ga.* 638 ; Call *vs.* Palmer, 116 U. S. 98 ; Stillman *vs.* Northrup, 109 N. Y. 473 ; Boylston *vs.* Bain, 90 Ill. 283; Cox *vs.* Mass. M. L. I. Co., 113 Ill. 382 ; Williams *vs.* Bryan (Texas), 5 S. W. Rep. 401 ; Vahlberg *vs.* Keaton, (Ark.) 11 S. W. Rep. 878.

And the same rule applies where the negotiation is through brokers. Brown *vs.* Scotch, etc. Co., 110 Ill. 235 ; Hoyt *vs.* Pawtucket, etc. Co., 110 Ill. 390 ; Haldeman *vs.* Mass. M. L. I. Co., 120 Ill. 390.

The prevailing opinion seems to be that, with knowledge on the part of the lender, the loan is infected, where his own agent exacts a *bonus.* Bonus *vs.* Trefz, (N. J.) 2 Atl. Rep. 369 and notes ; Payne *vs.* Newcomb, 100 Ill. 614 ; Thompson *vs.* Ingram, (Ark.) 11 S. W. Rep. 881.

As to when knowledge ought to be imputed or implied, see Vahlberg *vs.* Keaton, *supra.* In Call *vs.* Palmer, 116 U. S. 98, *supra*, the agent of the lender took commissions, and the notes (and presumably the mortgage) were made payable to him ; and there it was held by the Supreme Court of the United States that the loan was pure as between his principal and the borrower, the principal having no knowledge as to the charge or receipt of commissions by the agent. See also Dayton *vs.* Moore, 30 N. J. Chan. 543, where the

mortgage was made to the mortgagee's attorney, who was not described as such in the instrument. The true position of Tallman until he transferred the mortgage and the notes, was that of a trustee holding for the benefit of Griswold, the real lender; and though Tallman shared in the commissions, as the lender did not know of it, he was not affected thereby.

3. The station of the central intermediary (whose name was Lawton) was at Macon. Through him an application was made by Hughes, the borrower, for the loan. This application was partly in print and partly in writing. It contained answers to numerous questions, a description of the land offered as security and a plat of the same, the whole concluding with a promise " to pay all expenses incurred in negotiating the above loan, examining the premises, investigating the title to the land offered as security, and executing all necessary papers." According to Lawton's testimony, these expenses were then or afterwards agreed upon and fixed at $150, which was the amount retained out of the loan. And Hughes himself testified that he did not demur to paying Lawton his commissions; by which he doubtless meant this gross sum of $150, the whole of which was deducted by Lawton at the time he paid to Hughes the net proceeds of the loan, to wit, $850. The manner in which these proceeds reached Hughes is another circumstance which distinguishes this case from *Merck's* case. The application bears date in May, and a lender was not found till September. The application being examined at Hartford by Griswold, the lender, in person, he made known to Moore & Co., Tallman's firm, his acceptance of the same, and delivered the $1,000 to them, which they deposited in bank to their credit. They telegraphed to Lawton that the application was approved; by which they meant that a

Hughes *vs.* Griswold.

lender had been found.   After receiving this telegram, Lawton had the mortgage executed by Hughes, and thereupon advanced to him, of his own funds, $850, at the same time checking upon Moore & Co. for $1,000, the amount requisite to reimburse himself for this advance and to pay the agreed commissions.   Whilst the circumstance that the borrower got Lawton's money, and not that which belonged to Griswold, or ever had belonged to him, complicates the matter somewhat, we think the true interpretation of this transaction, under all the circumstances, is, that it was only a mode and means of exchange.   Griswold's money was in Hartford, Connecticut; Lawton's at Macon.   The latter was substituted for the former; and by reason of this substitution, Lawton became the equitable owner of an equivalent amount of the money which was on deposit in Hartford.   It was there under the control of Moore & Co., his agents, and might be considered therefore as in his own hands.   The testimony was clear that Lawton had no purpose to lend his money to Hughes; that although he did not know who the real lender was, yet he did know that some person had agreed to make the loan, and he intended the advance of his own money to be temporary, and made it for convenience and to save time.   Of course, had he been the real lender, and used the mortgage, notes, etc. as a cover and device to secure a loan made by himself, the transaction would have been usurious; and so in effect the court charged the jury, submitting to them fairly and fully the question of whether the loan was really made by Lawton, and whether there was any device or contrivance by him to cloak usury.   The evidence shows clearly that Lawton carried on an independent business, as did Nelson & Barker in the *Merck* case, and as did one or more of the intermediaries in the N. E. Mortgage Security Co.

*vs.* Towns, (Miss.) 1 South. Rep. 242. He it was who paid the compensation of both the other intermediaries, by contract made severally with them, to which neither the borrower, Hughes, nor the lender, Griswold, was a party, and of the existence of which they were alike ignorant.

4. Although it was shown that Lawton had advertised that he would loan money, and although he had doubtless loaned money, as he was a banker, the proof being that he did not loan it on this occasion, and the jury having found that he did not, the advertisement has no material bearing on the present controversy.

5. Both Lawton and Moore & Co. took part in facilitating the payment and transmission of accrued interest on this loan, Lawton on several occasions giving notice to the borrower that interest was soon to become due, and requesting that it be forwarded promptly through him, so as to meet the interest notes at maturity. These services were beneficial to both the lender and borrower, and as they seem to have been rendered voluntarily, they were doubtless beneficial also to the business of the intermediaries. No express stipulation appears, either as to rendering them or as to paying for them, and we see not how they could have tainted the loan with usury. Furthermore, if they did taint it, we are unable to see how any deduction on account of them could be made from the debt, as there was no proof of their value.

Upon the whole, we are convinced that there is nothing in this case to distinguish it legally, upon the question of usury, from that of the *American Freehold, etc. Co. vs. Merck.* Although we have not discussed the grounds of the motion for a new trial specifically, we have dealt with the real questions which underlie them, and which control the case.

6. Six of the grounds, however, were not considered at all, for they go to the overruling of objections to certain evidence, and as it nowhere appears what these objections were, they were not properly before us for adjudication.

The result is that, so far as appears to us from the record, the court committed no error in upholding the verdict in favor of the plaintiff below for the whole debt, principal, accrued interest and attorney's fees, or in denying the motion for a new trial.

Judgment affirmed.