# Staunton

STAVROLA CHAKALES AND GEORGE CHAKALES V. CONSTANTINE
J. DJIOVANIDES, SOMETIMES CALLED COSTT JOHN,
AND JOHN P. GOODMAN, TRUSTEE.

September 21, 1933.

Present, Campbell, C. J., and Epes, Hudgins, Gregory and
Browning, JJ.

50

The opinion states the case.

*John J. Wicker, Jr.,* and *Kirk L. Woody,* for the appellants.

*Plummer & Bohannan* and *Heflin & Adams,* for the appellees.

EPES, J., delivered the opinion of the court.

This is a suit in chancery brought by Constantine J. Djiovanides (commonly called Costt John) and John P. Goodman, trustee, against Stavrola Chakales and her husband, George Chakales. A decree was rendered in favor of the complainants, from which decree the defendants are appealing. The parties will be herein referred to as complainants and defendants as they appeared in the circuit court.

The subpoena summoning the defendants to answer the bill was issued on March 27, 1931, and the original bill was filed that day. The amended bill, which was filed April 16, 1931, alleges the following facts as the basis of the relief prayed for:

Stavrola Chakales owns a lot on Main street in the city of Hopewell, Virginia, which has on it a brick building which is divided into two storerooms, which are referred to as the large store and the small store.

By a duly recorded deed of trust, dated May 26, 1930, Stavrola Chakales and her husband, George Chakales, conveyed this property to John P. Goodman, trustee, in trust to secure the payment of a principal note of even date for $15,000 payable five years after date, and ten notes for $450 each, representing the semi-annual installments of interest on the principal note at six per cent per annum. All eleven notes are drawn by Stavrola Chakales and George Chakales payable to their own order at the Hopewell Bank and Trust Company, are by them endorsed, and are now and always have been held by Costt John.

This deed of trust contained the following provisions:

"It is understood and agreed between the parties that the noteholder, Constantine J. Djiovanides, is to collect all rents accruing in a certain storeroom upon said property on which this deed of trust is given, it being the larger storeroom of two (2) certain storerooms; by the signing of this instrument the said parties of the first part are assigning all rents to the said Constantine J. Djiovanides, for the duration of the period for which this loan is

granted, the said Constantine J. Djiovanides is to apply the said rent first to the payment of the interest on this trust, second to the payment of taxes and insurance and third to the upkeep of said building and that at the end of each year the said Constantine J. Djiovanides is to furnish a report of the amount of money collected and disbursed to the said parties of the first part and if there be any difference after paying all expenses, including interest, then the said Constantine J. Djiovanides is to apply same on the principal note:

"It is also understood that should this storeroom become vacant at any time during the period of this trust then the said Constantine J. Djiovanides shall have the right to collect the rents from the adjoining storeroom which is the smaller of the two, the assignment of this rent is given for the express purpose of taking care of the expenses created by this trust, and that this assignment shall take priority over any other assignment or over any order of the court; in the event that this assignment of rent is terminated without any cause of the said Constantine J. Djiovanides, then it shall become the duty of the trustee at the request of the noteholder to advertise and sell the above described property according to the terms of this trust, *the failure to collect the rents shall be deemed a breach of the covenants which shall make all notes due and payable at once.*

"In the event that default shall be made in the payment of said principal or any of the interest notes or any renewal thereof at maturity or of the taxes or insurance premiums as hereinafter provided or in the event of the breach of any of the covenants herein contained, then it shall be the duty of the trustee, on being requested so to do by the holder of said notes or renewal to take possession of and sell the property hereby conveyed, after first advertising the time, place and terms of sale * * * and out of the proceeds of such sale the said trustee shall pay first the costs and expenses of this trust and next the said note or notes or renewal thereof and the surplus, if

any, he shall pay over to the said Stavrola Chakales, her personal representatives or assigns.

"The said Stavrola Chakales and George Chakales, during the continuance of this trust, shall pay all taxes upon the property hereby conveyed as the same shall become due and payable, and shall keep the buildings thereon insured in some reliable insurance company against loss by fire for the benefit of this trust, in such sum as shall prove satisfactory to the said trustee; and pay the insurance thereon; and in default of the payment of such taxes or insurance premiums when due, the said trustee or the holder of the said note or notes or renewal may pay the same, and all sums so paid shall be deemed a part of the expenses of this trust." (Italics ours.)

On May 26, 1930, as a part of the same transaction, a written agreement relating to the assignment of rent mentioned in the deed of trust was made and signed by Stavrola Chakales and Constantine J. Djiovanides, the material parts of which are quoted in the footnote.[1]

The covenants in the deed of trust have been broken in four particulars, and by reason of these breaches Costt John has become entitled to have the trustee take pos-

---

[1] "Whereas, the said Constantine J. Djiovanides has advanced the sum of $15,000 on a certain building owned by the said Stavrola Chakales, in the city of Hopewell, and located on Main street, of which he has secured himself by a first deed of trust on said property, and realizing that in order that the interest on said loan and taxes and insurance and upkeep of said building must be taken care of by the rents and returns of the said storerooms located on said property, it is agreed that the said Stavrola Chakales does hereby assign all the rents and profits of a certain storeroom, which is the larger of two (2) storerooms, to the said Constantine J. Djiovanides in order that he may collect all rents from said storeroom of which he is to apply to the terms as mentioned in this agreement.

"It is understood that the said Stavrola Chakales is to collect the rents from the smaller storeroom of said building as long as the larger storeroom is rented and the revenue derived from said storeroom is ample and sufficient to take care of the interest, taxes and insurance on the said loan of $15,000, but should the large storeroom become vacant, or the rents that are derived from said storeroom are not sufficient to carry out the terms of this agreement,

session of the property and make sale thereof in accordance with the terms of the deed of trust.

The four particulars in which the covenants of the deed of trust have been broken are: (1) The makers have failed and refused to pay the interest note due November 26, 1930. (2) They have failed to pay the premiums on the insurance on the property, and Costt John has paid one of them. (3) The buildings on the property have not been kept in repair and are depreciating in value.[2] (4) The covenants with reference to the rent have been broken.

Costt John has required the trustee to proceed to make sale under the deed of trust; but there is a dispute and a conflict between Costt John and the defendants as to their respective rights, and the trustee believes that if he should endeavor to take possession of the property and try to make sale thereof he would be interfered with by the defendants.

In connection with the fourth breach of the covenant assigned, the bill makes these allegations:

"Your complainant, Costt John, for a short period after the execution of the said deed of trust and the said agreement collected the rents from the said property, which has been assigned to him, but the rents so collected were

---

then it is understood that the said Stavrola Chakales does by the signing of this instrument assign all the rents from the smaller storeroom during the period of the note secured by the deed of trust; if the larger storeroom shall remain rented during the terms and the rents shall justify the carrying out of this agreement, then it is understood that the smaller storeroom will not be taken over, but if the revenue from one storeroom does not justify carrying out the terms of this instrument, then it is understood the said Constantine J. Djiovanides shall collect the rents from both storerooms and that he shall apply the same, first to the interest notes on said loan of $15,000, pay the taxes and insurance and see that the upkeep of said building is taken care of and if there be any surplus at the end of twelve (12) months' period, then the said Constantine J. Djiovanides shall apply the difference to the principal note of $15,000."

[2] The evidence is so plainly insufficient to establish the third alleged breach that we shall not notice it further.

not sufficient to pay the taxes and insurance and to provide for the upkeep of the building upon the said property.

"For some months past the larger of the two storerooms mentioned in the said deed of trust and agreement has been in the possession of the son of Stavrola Chakales,[3] and the smaller of the said storerooms was until recently in the possession of George Chakales, the husband of the said Stavrola Chakales, but is now vacant and unoccupied and the said Stavrola Chakales is contemplating the removal of the partition between the two storerooms and converting the same into one room, all of which is in violation of the agreement between your complainant Costt John and the said Stavrola Chakales and is against the interest of your said complainant. Your said complainant further alleges that within the past few days he has received an offer of fifty dollars ($50) a month for the smaller of the said storerooms.

"Your complainant has made demand upon the tenants of the said property for the rent due thereon, as he had the right to do, * * (but) they have refused to pay the same and have told your said complainant that he would have to go to court to collect the same, and * * no rent has been paid your complainant by either of the tenants now in possession of the said property. Your complainant further alleges that the said property was placed in the possession of the members of the family of the said Stavrola Chakales in order to defeat your said complainant in the collection of the said rents and in order to make noneffective the provisions of the said deed of trust and agreement with respect to the collection of the said rents. That the assignment of the rent has been terminated without any default or cause on the part of your said complainant, and that the failure to collect the

---

[3] We use here the language of the original bill as there is clearly a typographical error in the text of the amended bill.

said rent or to pay the same is a breach of the covenants referred to in the said deed of trust, and that all the notes secured thereby are, under the express provisions of the said deed of trust now due and payable and are unpaid."

The material prayers of the bill, which also contains a prayer for general relief, are as follows:

(1) "That this court will direct the said trustee in the performance of his duties."

(2) "That the court will instruct the said trustee to make sale of the said property and that the court will enjoin and restrain the said Stavrola Chakales and George Chakales, their agents, servants and employees from interfering with the said trustee in the performance of any duties imposed or in the exercise of any powers granted by the said deed of trust or conferred upon him by this court."

Stavrola Chakales filed her separate answer in which she admitted the allegations of the bill as to the text, execution and delivery of the notes, deed of trust and contract mentioned in the bill, but denies every other allegation made in it. Her answer then pleads that the notes were given for and the deed of trust executed to secure an usurious loan made to her and her husband by Costt John; that the contract in question had been adjudged to be usurious in a common-law action brought in the Corporation Court for the city of Hopewell by her against Costt John to recover the usurious charges ($1,700) made by him for making this loan; that in this action a judgment was rendered in her favor for the recovery from Costt John of these usurious charges, which judgment has been paid by him; and that because of the usury Costt John forfeited all right to collect any of the interest notes secured by the deed of trust.

The answer of George Chakales is materially different from that filed by his wife. It makes no charge that the loan secured by the deed of trust was usurious. His answer is very short and the material parts of it read:

"This respondent * * says: That he denies each and

every allegation contained in the complainants' bill, with the exception of the execution and delivery of the deed of trust and the contract therein mentioned, and calls for strict proof of each and every other allegation therein contained."

It is further to be noted that George Chakales introduced no evidence on his behalf in this suit; and that when his deposition was taken by his wife he denied on cross-examination that either he or she had agreed to pay Costt John the $1,750 "bonus," which he claimed that Costt John charged them for making them the loan secured by the deed of trust here in question.

On January 14, 1932, the court entered the decree here appealed from, the material parts of which read:

"The court being of opinion that there has been a default in the payment of certain interest notes secured under the deed of trust mentioned in these proceedings, as well as in the payment of taxes and insurance premiums, the court doth adjudge, order and decree that John P. Goodman, trustee, do make sale of the property conveyed in the said deed of trust, in accordance with the provisions thereof, and the court doth further adjudge, order and decree that Stavrola Chakales, their agents, servants and employees be, and they are hereby, enjoined and restrained from interfering with the said trustee in the performance of any duties imposed or in the exercise of any of the powers granted by the said deed of trust."

The first assignment of error which we shall notice is that the court erred in adjudging that there had been a default in the payment of interest on the debt secured by the deed of trust in the bill mentioned. This contention is predicated upon these two contentions: (1) The evidence establishes that this transaction was an usurious loan made by Costt John to the defendants. (2) It is *res adjudicata* between these parties that this was an usurious transaction.

If either of these points be well made, Costt John is entitled to recover from the defendants only the prin-

cipal sum loaned by him to the defendants when it becomes due, and their failure to pay to him the interest notes according to their tenor does not constitute a default for which Costt John may foreclose the deed of trust. Section 5552, Code of Virginia 1919.

The complainants introduced four witnesses, Chris Kehayas, Nick Venech, Costt John and John P. Goodman, who gave testimony bearing on the questions now under consideration. George Chakales introduced no witnesses, but his deposition and that of Archer L. Jones were taken and introduced by Stavrola Chakales, and their testimony is all the testimony introduced by either of the defendants which bears on these questions.

Mr. and Mrs. Chakales are Greeks, as are Costt John, Nick Venech and Chris Kehayas. Mrs. Chakales cannot read or write, and cannot speak English, and her business matters are attended to by her husband (George Chakales) almost as her *alter ego*. George Chakales and the others speak English, but their evidence shows that they all have difficulty in expressing themselves accurately in English.

So far as the record discloses, Costt John did not have any direct communication with either of the defendants during the negotiation and closing of the transaction here in question. Practically all the negotiations leading up to and connected with the consummation of it were conducted for the defendants by Nick Venech; but Chris Kehayas conducted some of the early negotiations, and in the latter stages of the transaction the defendants' attorney, John P. Goodman, was also acting for them in cooperation with Venech.

The story of this transaction as told by the complainants' witnesses is this:

The property of Stavrola Chakales mentioned in the bill was encumbered by a deed of trust (designated as the Theodore deed of trust), securing a note on which there was an unpaid balance amounting to approximately $11,000, which was long past due. The deed of trust

creditor had required the trustee to make sale of the property and the trustees had advertised the property for sale.

At the time this emergency arose, George Chakales was sick in bed; and he and his wife asked Nick Venech, a friend and connection of Mrs. Chakales, to "get somebody to raise money to pay up the mortgage so the property would not be sold in the public auction."

That night Venech saw Chris Kehayas and asked him to take up the mortgage for the defendants. Kehayas did not have the money, but said he would see Costt John and see what he could do. Kehayas went to see Costt John, who at first refused to have anything to do with the proposition, saying, "I cannot do anything. I do not want it. Don't mix me up with that man." However, Kehayas insisted, saying to Costt John, "Never mind what he is. * * You do him a favor in a Christian way to help him because he is sick and his wife is a poor lady;" and Costt John told him he would think it over. Later Kehayas went back to see Costt John and told him, "Those people don't want it free. You are working for them. Mr. Venech told me it is $1,000 they give to you for the trouble to find that money."

The next day Venech went to see Costt John. His account of what took place between the defendants and himself and between Costt John and himself is as follows:

"I went and saw Mr. Costt John and told him how things were exactly as they were explained to me, how much was the mortgage and he said he had no cash money in hand but he can raise the money from one of the banks which he had in Hopewell to put up mortgage on his own property.

"I came back and told Mr. Chakales what was going on and he told me with any consideration to raise that money and that he was going to make good when he got well and give whatever was paid. So I came back to Costt John and told him to consult the bank he was getting to raise the money. I cannot recall how much, but I

think at was something like $8,000 from the Hopewell Bank and Trust Company. * * *

"Chakales and his wife agreed to pay every dollar what the expenses were attached to the loan, the loan that Costt John was to make to Chakales. They promised to pay every penny to make the loan, like brokerage, recording fees, cost of search of title, or any expenses attached to it they were willing to pay. They were willing to pay everything, all the expenses attached to the loan, and too, the loan Costt John would have to make in order to raise the money for Chakales. Costt John told me when he went to the bank to borrow the money they would charge him something like five per cent for borrowing the money, because I asked him to make the mortgage for five years straight without any payment of the principal, just get the interest for five years straight. This agreement was made me by Chakales and his wife, and I was told to tell it to Costt John, which I did." * * *

The only reference made by Venech in his testimony to the $1,000 (hereinafter more specifically mentioned), which Costt John claims the defendants agreed to pay for his services is his answer to this question:

"Q. What agreement was had * * as to the payment to said Costt John for his services in connection with the negotiation for the loan to the defendants?

"A. That was the $1,000 which Chakales and his wife promised me to pay. The $1,000 was for Costt John's services to lend the money for five years."

Up to this point the negotiations had been conducted upon the assumption that $11,000 was all that the defendants would have to borrow to save their property from foreclosure. But "Costt John refused to take the mortgage unless the debts, judgments, and liens was paid on the property, because he thought it was not a legal mortgage to take."

The defendants then had Venech employ John P. Goodman as their attorney to examine the title and find out "what is the debts against the property." Goodman re-

ported that in addition to the Theodore deed of trust, there were some judgments and delinquent taxes which were liens on the property, and that it would require considerably more than $11,000 to clear up the title to the property.

Almost five weeks elapsed between the time Kehayas first approached Costt John about this transaction and the time the deed of trust mentioned in the bill was executed; and before the examination of the title had been completed and the necessary papers drawn up to close the transaction, the day set for the sale under the Theodore deed of trust arrived. Though the papers had not then been executed, on May 21, 1930, Costt John gave his check for the principal and interest due on this debt amounting to $10,957.58. However, the payment of $750 which was claimed to be due for trustees' commissions and attorney's fees for the collection of the note secured by the deed of trust was not made until later because the liability of the defendants for these items was disputed by Goodman; and when Costt John did, on May 29, 1931, pay this item he paid it "to John P. Goodman, attorney, to be held subject to order of court in payment of trustee's commissions and attorney's fees on note."

When the $15,000 note and deed of trust mentioned in the bill were drawn up and executed on May 26, 1930, Goodman had not ascertained exactly the total amount which would have to be paid out by Costt John for the defendants; but he estimated that including an item of $1,000 which he understood that the defendants were to pay to Costt John, $15,000 would be sufficient. In this estimate he did not include the $750 above-mentioned for commissions and attorney's fees under the Theodore deed of trust, because he thought that he would be able to make the trustee in the Theodore deed of trust account for rents of this property collected by him to an amount sufficient to cover this item. He is also very positive in his statement that he did not include in his $15,000 estimate any sum for "brokerages" or bonuses which Costt John might

have to pay to any other person to get the money to be advanced by him to the defendants.

Within a few days after May 26th, Goodman ascertained that the amounts of some of the liens were larger than he had thought; and then estimated that, including the trustees' commissions and attorney's fee claimed under the Theodore deed of trust and the $1,000 which the defendants were to pay Costt John, the defendants would have to borrow about $16,000 instead of $15,000. He and Venech went to see Mr. and Mrs. Chakales and explained this to them; and they instructed Goodman to draw up another note for $1,000 and secured it by a second deed of trust on the property, Mrs. Chakales saying, "All right, as long as he fix things like that go ahead and save the property." These papers were drawn up and executed on May 29th, the understanding being that if the whole of the $1,000 was not needed Costt John would credit the balance on the back of the note.

Goodman's testimony with reference to the source from which Costt John got the money paid out by him for the defendants and as to what, if any, sums were to be paid to Costt John by the defendants as compensation to him and for "brokerage" paid by him to other parties is included in the following questions and answers, and certain others which will be quoted later:

"Q. Do you know whether or not Costt John was to receive anything by way of compensation for getting together the money with which to pay off these various liens on the property, and for making disbursement of that money, and, if so, how much was he to receive?

"A. Mr. and Mrs. Chakales told me in their home, before the deed of trust was signed, that he was to get $1,000.

\* \* \* \* \* \* \* \* \*

"Q. Do you know, of your own knowledge, where Costt John got the money from to pay these various liens off?

"A. I know of $8,000 that was loaned by the Hopewell Bank and Trust Company. The other I do not.

"Q. Do you know anything with reference to the brokerage, if any, which Costt John was to receive in consideration of making this loan?

"A. I know of no brokerage between Costt John and Mr. and Mrs. Chakales. The only question of brokerage that I am acquainted with is the fact that Mr. Costt John had me call up the bank and ask them what brokerage they charged on money for three years, and for five years. And they informed me that it was about one per cent a year.

\* \* \* \* \* \* \* \* \*

"Q. Do you know of any agreement on the part of either of the Chakales to pay Costt John the five per cent, brokerage on $15,000, of one per cent a year?

"A. No, sir. As I said before, I never heard brokerage discussed between the Chakales in my presence.

\* \* \* \* \* \* \* \* \*

"Q. If you ascertained that it was necessary to prepare and execute a second deed of trust for $1,000 because of the fact that the $15,000 deed of trust would not be sufficient to take care of all the liens, encumbrances and expenses, didn't you consider, as a part of the expense in that, the $750 brokerage which Costt John was to receive?

"A. No, sir; I did not know anything about the brokerage.

\* \* \* \* \* \* \* \* \*

"Q. But you did count in the items which were to be disbursed, or which were to be taken care of, the $1,000 which Costt John was to receive for his services in getting this money and in paying out these various items?

"A. Yes, sir."

A few days after May 29th the $15,000 and $1,000 notes secured by the two deeds of trust above mentioned were delivered to Costt John by Goodman to whom they had been intrusted by the defendants. The proceeds of these notes were not turned over to the defendants. As has

been said, Costt John had expended for them $10,957.58 before the $15,000 note was executed. The residue of the proceeds were left in his hands to be paid out by him for the account of the defendants in accordance with the agreement made by Venech for the defendants with Costt John.

Costt John was slow in rendering the defendants a statement showing the amounts he had paid out for them. After several attempts they finally got him to render them a statement in the latter part of October or the first part of November, 1930. This statement showed that he had disbursed for their account $16,-089.25, and that they owed him $89.25 in addition to the amounts evidenced by their two notes held by him.

This statement is not in the record, but it appears from admission made by Costt John on his cross-examination that in it Costt John charged the defendants with an item of $1,000 denominated in the statement as a "bonus," an item of $750 for "brokerage" on the $15,000 secured by the first deed of trust, and also an item of $50 for "brokerage" on the $1,000 secured by the second deed of trust. He also admits that he told Mr. Goodman or his stenographer to put these charges in the statement; and there is nothing in the record which tends to show that there was on this statement anything to indicate or suggest that the $750 and $50 "brokerage" items had been paid or were payable, in whole or in part, to any person other than Costt John himself.

On cross-examination Goodman testified as follows with reference to this statement:

"Q. Was this [i. e., when the statement was made up] the first time you heard of the $750 brokerage?

"A. No; I had heard brokerage discussed between Costt John and Nick Venech and others, but as between Chakales and Mrs. Chakales and Costt John I never heard that discussed.

"Q. In that statement which was made up in your

office and sent or delivered to the Chakaleses, was the $1,000 described as 'bonus'?

"A. Yes, sir.

"Q. And that information was obtained from Costt John?

"A. Yes, sir.

"Q. There was a charge of $750 in that statement also for brokerage, was there not?

"A. Yes, sir.

"Q. And there was another charge of $50 bonus, on that statement for the $1,000 second deed of trust, was there not?

"A. (Referring to the statement) Yes, sir.

"Q. Then Costt John told either you or your stenographer to insert a charge of $50 for bonus on the second deed of trust?

"A. He evidently told my stenographer, because I did not prepare this paper (referring to statement).

\* \* \* \* \* \* \* \* \*

"Q. The $1,000 which you have mentioned in your statement was a bonus to Costt John for the loan of this money, was it not?

"A. That is what Costt John claims.

"Q. The $750 was brokerage on the same loan, was it not?

"A. That is the statement that Costt John made to my stenographer who prepared that paper."

Mrs. Chakales did not accept this statement as being a correct statement of the account of Costt John with her. Soon after she received it, she brought a common-law action in the Corporation Court for the city of Hopewell against Costt John to recover that part of the $16,000 which she claimed he still had in his hands belonging to her. The declaration (or notice) filed by her in this action was not introduced in evidence in this suit. But Costt John, upon his direct examination, introduced certified copies of the bill of particulars and of the grounds

of defense which were filed in this action in response to orders of the court.

In her bill of particulars (which was filed on November 16, 1930) Mrs. Chakales set forth that Costt John had agreed to lend her $16,000; that she executed and delivered to him notes of the principal amount of $16,000 which he accepted; that he had paid to her or for her account certain named items aggregating $12,854.24; and that he then owed her the balance of the $16,000, to-wit, $3,145.76.

The grounds of defense filed by Costt John read as follows:

"That there was a deed of trust on the property of the plaintiff located on Main street in the city of Hopewell, Virginia, which the owners thereof threatened to foreclose; that the defendant was approached by the plaintiff with the request that he advance certain moneys for the purpose of paying off said deed of trust; that it became necessary in order to effect a loan on said property, to clear the title thereto by paying off certain judgments, liens, debts, etc.; that the said plaintiff agreed with the defendant that she would pay him the sum of one thousand dollars ($1,000) as a commission on the sum approximately eleven thousand dollars ($11,000) if said defendant would lend said money to her for the purpose of taking up said deed of trust; that plaintiff and defendant agreed on said loan and the payment of said commission; that afterwards it was ascertained that additional money was required in order to effect the clearance of the title to said property, and the proper security of the loan to be made by defendant to plaintiff; that the plaintiff agree to pay all costs and expenses incident to the procurement of all necessary moneys by said defendant for her in connection with said loan; that to this end a note of fifteen thousand dollars ($15,000) was executed and secured by a first deed of trust on said Main street property; and that the same proving insufficient to pay all of the debts of said plaintiff which

the plaintiff had requested the defendant to pay off and discharge, including said deed of trust and the costs of obtaining the said money, that a second note of one thousand dollars ($1,000), secured by a second deed of trust on said property, was executed by said plaintiff and delivered to the defendant; that the said defendant accepted the two notes and paid out all the said money for and on account of said plaintiff, and that a statement of the account between the plaintiff and the defendant is as follows:"

The statement of account which is appended to the grounds of defense credits Stavrola Chakales with the two principal notes aggregating $16,000, and charges her with items paid for her account aggregating $16,003.66, in each case the person to whom the payment was made being named. Two of the items with which it charges her are as follows:

"Nov. 25—To Costt John, five per cent brokerage on $15,000 for five years, representing money advanced... $ 750.00
To Costt John, to fee and commission for services in paying debts and obtaining money to pay debts, as agreed between parties ..................... $1,000.00"

The account filed as a part of the grounds of defense does not include an item for brokerage on the $1,000 secured by the second deed of trust above mentioned, as did the original statement rendered to the defendants. Costt John admitted that in making up the statement filed with his grounds of defense he eliminated this item on the advice of his counsel that he had no right to charge it.

No other part of the record in the common-law action was introduced in evidence, but, without objection from Costt John, the defendants introduced an abstract of the judgment of the court in this action as it is docketed in the clerk's office of the Corporation Court of Hopewell. This abstract, in so far as it is here material, reads:

"Virginia: In the Corporation Court for the city of Hopewell, January 31, 1931.

"Stavrola Chakales, Plaintiff,
 "versus
"Costt John, Defendant.

"Action of judgment in favor of the plaintiff against the defendant for the sum of seventeen hundred and fifty dollars, with interest thereon at the rate of six per centum per annum, from January 15, 1931, until payment. * * And the cost of suit $14.50."

This judgment was paid in part by Costt John by cancelling the $1,000 note secured by the second deed of trust and releasing that deed of trust, and in part by the payment of $750, and the costs, to Mrs. Chakales.

In order to get all the evidence relating to the common-law action together, we shall diverge here, and refer to the testimony of Archer L. Jones, who had represented Mrs. Chakales as her attorney in this action, whose deposition was taken and read in this suit by her. On direct examination he testified as follows:

All the items of the account filed by Costt John in his grounds of defense in the common-law action were accounted for in one way or another by Costt John, with the exception of the items of $1,000 and $750. These "were not accounted for except on the theory of bonus and good will." * * "There was evidence in reference to the $1,000 bonus and $750 brokerage," (but he does not state what the evidence was). The court instructed the jury that "if Costt John had charged $1,000 bonus, or good will, I believe they called it, for making the loan and $750 brokerage and six per cent interest, then the charge of $1,000 and $750, making a total of $1,750, was illegal and void and could be recovered by Mrs. Chakales from Costt John; and the jury so found," and brought in a verdict for her for $1,750. But on cross-examination Mr. Jones also testified that Mrs. Chakales

testified in this common-law action that she "had not contracted to pay Costt John the brokerage and bonus" which he had mentioned in his direct examination.

Except as has been heretofore stated the evidence discloses nothing further with reference to the pleadings, evidence or instructions, verdict, or judgment in the common-law action.

We return now to the testimony introduced by the complainants.

Costt John's testimony with reference to the $1,000 item which he claims the defendants agreed to pay him is contained in the following questions and answers taken from different parts of his testimony, all except the first being taken from his cross-examination:

"Q. Did you agree with these people as to what security you were to receive, and what remuneration you were to receive for your services in connection with the money and for the loan of the money?

"A. Only Chris Kehayas come to my store and told me: 'If you save this man, Mr. and Mrs. Chakales, they will give you $1,000 for your trouble.

\* \* \* \* \* \* \* \* \*

"Q. On your original statement [*i. e.*, that rendered the defendants in October or November, 1930] there is a charge of $1,000 bonus for making this loan. That is correct, isn't it?

"A. No, that is not bonus. Chakales' wife and Mr. Chakales told me: 'If you do us a favor and not let George Theodore sell our property and push us in the street, we will give you the $1,000 because you do us a favor.'

"Q. So you say the statement, in calling that a bonus is wrong?

"A. I cannot say it is wrong. My attorney changed it.

"Q. You told Mr. Goodman it was a bonus, didn't you?

"A. No, this is Mr. Goodman's statement [*i. e.*, he prepared it for Costt John].

"Q. I say, you told Mr. Goodman that it was a bonus, didn't you?

"A. Maybe I did.

"Q. You testified before the jury in the corporation court that it was a bonus, didn't you?

"A. Not about the $50.

"Q. I am talking about the $1,000.

"A. That was because I did him a favor not to let them put his stuff in the street, and not to let them sell his house. It was not a bonus. I did not lend him the money to get from him a bonus.

\* \* \* \* \* \* \* \* . \*

"Q. You knew, did you not, that the $1,000 which you charged him [them] was for the loaning of this money?

"A. No, that $1,000 was if I go around and get the money from you, or from the bank, or from any other man, because I told them I did not have any money."

Costt John's testimony on his direct examination with reference to the $750 brokerage charge is found in this question and answer:

"Q. What was said about the expense of securing this money?

"A. Nick Venech told me: 'All of the expenses of recording, and the judgments, and one per cent bonus for the bank that I had to pay all of them, and to charge it to him, Chakales.' "

On his cross-examination he testified as follows: He paid for the defendants to others than himself $15,003.66. This money he got from the following sources: $8,000 from the Hopewell Bank and Trust Company, $4,000 from his brother, and $3,000 from his wife. The whole of the $750 was paid by him to the bank, his brother and his wife as brokerage at one per cent per year for five years on the several amounts he borrowed from them.

But his categorical statements as to the persons from whom he borrowed the $15,000 and as to the payment by him to them of five per cent "brokerage" on the amounts borrowed from them must be considered in the light of

his other testimony on these points, which we give below in his own language. In giving this testimony, where to do so does not distort the meaning of the witness, we have sometimes placed more than one answer under a question, and have supplied from the omitted questions and placed in brackets the words necessary to make his statement complete and his meaning clear.

"Q. Is that your reason for paying to yourself on November 25th, $750 as five per cent brokerage on $15,000 for five years, representing money advanced?[4]

"A. No. I did not pay myself that. That money was paid downstairs, a part of it, in the bank, which you have got a receipt for. It was borrowed at the bank, and one per cent on every $100 is paid for the five year period. I paid that at the bank. * * I paid that money downstairs on May 27, 1930. * * I did not pay it to myself because it was not my money; it was somebody else's money in the bank. * * At the time we made the statement [which was filed in the common-law action] we put the date down [as November 25th], but that money was actually paid before that. * * We borrowed the money on the 27th day of May from the bank for George Chakales, and at that time we paid the brokerage to the bank.

"Q. You mean to tell the court that your statement in your grounds of defense that on November 25th you paid to yourself $750 as five per cent brokerage on the $15,000 loan for five years is false?

"A. I did not pay it to myself. I paid it to the bank and to my wife and to my brother. I cannot use good English. I said myself.

"Q. Now as a matter of fact you did not pay any portion of this money to your brother, did you?

"A. Yes. * * The cash money. We do not use much checks. * * [He lives] in New York. * * [I got this

---

[4] He had just testified that the reason he did not render the defendants a statement before the latter part of October, 1930, was because "I tried to save Mr. and Mrs. Chakales money."

money from him] on May 2d [1930] or something like that. * * [I got] $4,000 [from him in] cash. * * [I paid him the brokerage on it] after I loaned the money to Chakales * * about June 14th or June 15, 1930, something like that. * * [When I got the $4,000 from him] he. was here * * at my house.

"Q. What did you do with the $4,000 when you secured it from him?

"A. I put it here in my business.

"Q. Deposited it here?

"A. No sir; kept it in my pocket.

"Q. Do you mean that you carried it around for months in your pocket?

"A. No, sir. I kept it in my safe at the store and deposited it here. * * Some day in May, between [May 2d] and the first of June. * * [I deposited it] a little at a time. * * I think about $400 or $500 [at a time].

"Q. What was your idea in depositing the loan which you had secured of $4,000 in the bank at $400 or $500 at a time?

"A. Because I had check coming in. You do not deposit all at once. * * * .

"Q. What did you give him as evidence of the fact that you had secured this loan from him?

"A. Oh, we Greeks owe each other $40,000 or $50,000 without any note or security. * * Why, any time we need money, we do not have to have an agreement.

* * * * * * * * *

"Q. Have you any record of when your wife loaned you money?

"A. No. I haven't any record. * * [She gave it to me] by hand, in money. * * She had it in cash money * * in the bank, I think. * * [She had it] at six per cent interest, I think * * . [it was deposited] in her name in a bank in Petersburg, * * the Virginia National Bank. * * [She drew it out] three or four days before the 26th I think.

"Q. She drew the money out and brought it to you?

"A. That is what she said.

"Q. Have you ever seen her account in the Petersburg bank?

"A. No, sir."

As has been heretofore noted, George Chakales did not introduce any evidence on his own behalf, and the only witnesses introduced by Stavrola Chakales whose testimony has any bearing on the questions now under consideration were Archer L. Jones (whose testimony has been heretofore given) and George Chakales.

Neither upon his direct nor his cross-examination was George Chakales asked any questions as to the negotiations leading up to or the circumstances surrounding this transaction. On his direct examination he was asked if Mrs. Chakales did not recover a judgment against Costt John for $1,750 and, if so, what it was for, and replied that she did, and that it was for "overcharge and bonus." He was then asked whether there was any charge for bonus in the original statement rendered them by Costt John, and replied that there was, that "the amount of the bonus" was $1,750, and that there were two items of it, one for $1,000 and one for $750. In reply to the question, "Was any brokerage charged?" he replied, "bonus, that's all."

All that his cross-examination contains on these points is the statement that he had fallen out with Costt John because "he overcharged me on the $16,000 for the loan," and these questions and answers:

"Q. You say that Costt John charged you $1,750 bonus?

"A. Yes, sir.

"Q. Did you agree to pay it?

"A. The court agreed.

"Q. I ask you again, did you agree to pay it?

"A. No, sir.

"Q. Did your wife agree to pay it?

"A. No, sir."

The contention of the defendants that the record here before us establishes that it is *res adjudicata* that the loan

here in question was an usurious transaction is not well made.

The definition of what transactions are usurious in Virginia is found in section 5552, Code, Virginia, 1919,[5] which reads:

"Contracts, etc. for more, illegal.—All contracts and assurances made directly or indirectly, for the loan or forbearance of money or other thing at a greater rate of interest than is allowed by the preceding section,[6] shall be deemed to be for an illegal consideration as to the excess beyond the principal amount so loaned or forborne." Sections 5552-5557 also relate to the subject of usury, but they do not make any transaction usurious which is not made usurious by the provisions of section 5552.

Under such a statute, where there has been no agreement by the borrower, expressed or implied, to pay more than the legal rate of interest for a loan of money, the subsequent withholding or attempting to withhold by the lender, without the assent of the borrower, of a part of the proceeds of the loan (whether as a bonus, or as brokerage, or under some other pretext) does not constitute usury, or the payment by the borrower of an excess beyond the lawful rate of interest for the loan or forbearance of money. It is merely a wrongful detention of money for which the borrower has a right of action.[7]

If, after a loan untainted by usury has been made

---

[5] For history of these and related sections of the Code, see *Moseley* v. *Brown*, 76 Va. 419.

[6] The preceding section allows six per cent per annum.

[7] *Frye* v. *Barker*, 1 Pick. (18 Mass.) 267; *Dunlap* v. *Chenoweth*, 88 N. J. Eq. 496, 104 Atl. 822; *Guggenheimer* v. *Geiszler*, 81 N. Y. 293; *Morton* v. *Thurber*, 85 N. Y. 550; *In re Wilde's Sons* (D. C.) 133 Fed. 562; *U. S. Mortg. Co.* v. *Sperry*, 138 U. S. 313, 351, 11 S. Ct. 321, 34 L. Ed. 969; *Hawhe* v. *Snydaker*, 86 Ill. 197, 200-201; *Weicker* v. *Stavely*, 14 N. D. 278, 281, 103 N. W. 753; *Hammond's Adm'r* v. *Smith*, 17 Vt. 231; Webb on Usury, section 32; 39 Cyc. 947. See, also, *Moseley* v. *Brown*, 76 Va. 419, 423 *et seq.* In *Ward's Adm'r* v. *Cornett*, 91 Va. 676, 681, 22 S. E. 494, 495, 49 L. R. A. 550, this court has said: "A debt, to be usurious must be so in the begin-

and while the proceeds are still in the hands of the lender to be expended by him for the account of the borrower, the lender *without the assent* of the borrower retains a part of it under such circumstances that it amounts to his taking more than the legal rate of interest for the loan, this does not constitute usury, or the payment by the bor- rower of an excess beyond lawful interest. It is merely the unlawful withholding of money; and the sum so with- held may be recovered from the lender, even though the action to recover it is not brought within one year after such retention has been made. On the other hand, if the retention by the lender be *with the assent* of the borrower given after the loan was made, it is, in effect, a payment by the borrower of an excess beyond the lawful interest for the loan; and the borrower may both at common law and under section 5555,[8] Code, Virginia, 1919, recover the excess beyond legal interest so paid by him. But to do so in Virginia he must, by reason of the provision of sec- tion 5555, bring his action within one year from the time such excess was, in effect, paid by him. In neither case, however, is the original valid contract vitiated either as to the payment of the principal or the legal interest stipu- lated for. See in this connection *Moseley* v. *Brown*, 76 Va. 419, and authorities cited in note 6.

The evidence relating to the common-law action shows that the verdict of the jury might have been based

ning. It cannot be made so by subsequent events." Also in *Pollard* v. *Baylors*, 6 Munf. (20 Va.) 433, 438, the court said: " * * whether a contract is usurious or not, is to be decided with reference to the *time when it was entered into;* * * a contract legal at *that* time cannot be made usurious by subsequent events." See, also, 39 Cyc. p. 992, section 85, and p. 918, section 3.

[8] The material part of section 5555 reads as follows: "Section 5555. Excess over legal interest may be recovered back. If an excess be- yond the lawful interest be paid in any case for the loan or for- bearance of money or other thing, the person paying the same may in a suit or action brought within one year thereafter recover the full amount of such payment from the person with whom the con- tract was made or to whom the assurance was given; and it may be so recovered from such person notwithstanding the payment of the excess be made to his indorsee or assignee."

either (1) upon a finding that Mrs. Chakales had agreed to pay Costt John an usurious consideration for the loan to her of money, or (2) upon a finding that Mrs. Chakales had not agreed to pay Costt John the $1,000 and the $750 item composing the $1,750 for which it found a verdict, and that he was attempting unlawfully and without her assent to withhold these sums from her. This being true, the judgment does not estop Costt John from asserting in this suit that the transaction here in question was not an usurious loan.

Where the second action is upon a claim or demand different from that asserted in a prior action between the same parties, the judgment in the prior action operates as an estoppel only as to those points or questions which were actually determined by the verdict of the jury. If the prior action involved two issues of fact, upon either of which standing alone the verdict properly might have been predicated, and it does not appear from the record upon which issue it was found, unless the uncertainty is removed by extrinsic evidence showing upon which issue it was found, neither issue is *res adjudicata* in a subsequent action between the same parties upon a different claim or demand.[9] *Chrisman's Adm'r* v. *Harman,* 29 Gratt. (70 Va.) 494, 26 Am. Rep. 387; *Hairston* v. *Hairston,* 117 Va. 207, 212, 84 S. E. 15; Biglow on estoppel (6th Ed.) 63; Black on Judgments (3d Ed.) sections 614, 616, 624; 1 Van Fleet's Former Adjudication, sections 274, 277, 279.

The next question which requires consideration relates

---

[9] For cases from other jurisdictions see: *Russell* v. *Place,* 94 U. S. 606, 24 L. Ed. 214; *Washington, etc., Co.* v. *Sickles,* 24 How. (U. S.) 333, 344, 16 L. Ed. 650; *McDowell* v. *Langdon,* 3 Gray (69 Mass.) 513; *Lea* v. *Lea,* 99 Mass. 493, 96 Am. Dec. 772, and note pp. 775-788; *Littlefield* v. *Huntress,* 106 Mass. 121, 126; *Zoeller* v. *Riley,* 100 N. Y. 102, 107, 2 N. E. 388, 390, 53 Am. Rep. 157; *Bergeron* v. *Richardott,* 55 Wis. 129, 12 N. W. 384; *Strauss* v. *Meertief,* 64 Ala. 299, 311, 38 Am. Rep. 8; *Slater* v. *Skirving,* 51 Neb. 108, 70 N. W. 493, 66 Am. St. Rep. 444; *Jones* v. *Beaman,* 117 N. C. 259, 23 S. E. 248.

to the effect to be given the testimony of Archer L. Jones and George Chakales on their cross-examinations which bears upon whether the defendants had agreed that they would pay Costt John the $1,000 and the $750 items, which form the basis of their charge of usury. The precise question is this, does this testimony, as a matter of law, preclude the defendants from asking that this transaction be held to be usurious on the testimony given by Costt John and the other witnesses introduced by the complainants? We are of opinion that this question should be answered in the negative for several reasons:

■■ (1) The testimony of Archer L. Jones as to what Mrs. Chakales testified in the prior action does not estop her from asserting in this suit that the contrary is true; and as George Chakales was not a party to the prior action, it clearly does not estop him from so doing. The testimony given by a party as a witness in his own behalf in a prior action may be introduced in evidence by the other party in a subsequent action between the same parties, if it is relevant; but it does not, as a matter of law, work an estoppel against the party who gave such testimony in the prior action. *Owen* v. *Palmour,* 111 Ga. 885, 36 S. E. 969; 5 Wigmore on Ev. (2d Ed.) section 2594.

■■ (2) A plaintiff in a suit or action has no more right to ask a jury or the court to disbelieve positive and unequivocal statements of fact made by him of his own knowledge as a witness in his own behalf, than a defendant has to ask it to disbelieve similar statements made by him as a witness in his behalf. The real party in interest in this suit is Costt John. He, as well as his other witnesses, testified positively and unequivocally of their own knowledge that the defendants, through their agent, Nick Venech, promised Costt John to pay him $1,000 and all expenses incurred by him, including any "brokerage" he might have to pay. He will not be heard to ask that, as a matter of law, the defendants shall be concluded to his advantage by a denial by them that this was true.

■ (3) Perhaps, as George Chakales acted practi-

cally as the *alter ego* of his wife in her business matters, was a necessary co-defendant with her in this suit, was introduced as a witness by her, and his testimony stands uncontradicted by her or any witness introduced by her, she should be held to be concluded by his testimony to the same extent that he is concluded thereby. But even if this be the correct view to take, we are of opinion that the testimony of George Chakales here under consideration is not of that nature which should be held, as a matter of law, to preclude either him or Mrs. Chakales from contending, and asking the court to hold, that the testimony introduced by the complainants shows that this was an usurious transaction.

This court has held in a number of cases that the testimony of a party to a suit or action as to facts that are within his own knowledge, which were adverse to him, were binding upon and conclusive against him as a matter of law. *Massie* v. *Firmstone,* 134 Va. 450, 462, 114 S. E. 652, 656; *Davis Bakery* v. *Dozier,* 139 Va. 628, 640, 124 S. E. 411, 415; *Bassett & Co.* v. *Wood,* 146 Va. 654, 660, 132 S. E. 700; *Virginia Elec. & Power Co.* v. *Lenz,* 158 Va. 732, 164 S. E. 572. Where the testimony of a party is of such a nature that it must be either true or false, the law does not allow a party to recover, or defeat a recovery by an affirmative defense upon which he has the burden of proof, when his testimony, if true, utterly destroys his case. But a party who testifies in his own behalf does not do so at the peril of being concluded by every statement made by him which is a mere slip of his tongue or due to his not having understood the full import of the question asked him, as seems to have been the situation in this case.

The question asked George Chakales was whether he or his wife had agreed to pay Costt John the "1,750 bonus" which they claimed he charged them. To this question he answered, No. But he was not asked whether they had agreed to pay him a bonus or fee of $1,000 and all "brokerage" charges and expenses he should incur; and

no questions were asked him by counsel for either side which sought to have him make his answer more specific. It is also to be noted that he was not asked whether he or his wife had authorized Nick Venech to make the agreement with Costt John, which Venech says he made with him; and that he does not anywhere contradict Venech's very specific testimony that the defendants did authorize him to make, and that he did make, such agreement with Costt John. Further, both defendants are Greeks. Mrs. Chakales cannot read, write or speak English, and George Chakales has difficulty in expressing himself with accuracy in English. When these facts are taken into consideration, we think that the testimony of George Chakales here under consideration should not be held, as a matter of law, to conclude the defendants from contending that a contract had been made for them by their agent, Nick Venech, with Costt John under which they were obligated to pay him $1,000 and all expenses incurred by him, including "brokerage."

When we come to consider the evidence without giving any of it the force of an estoppel, the great preponderance of it supports, if indeed it does not require, a finding that Nick Venech told Costt John that the defendants would pay him $1,000 and all expenses he incurred, including any "brokerage" he might have to pay, and that in so doing he was acting as the agent of the defendants, within the scope of his apparent authority, and in accordance with the general understanding he had with the defendants; and so we find.

This brings us to this question, does the evidence introduced by the complainants establish that the transaction between Costt John and the defendants was a loan by him to them of money or other thing at a greater rate of interest than is allowed by law? (Section 5552, Code of Virginia 1919.) We are of opinion that it does.

The fact that a lender has to borrow from a third person the money loaned by him does not give the lender license to charge the borrower more than the high-

est lawful rate of interest *for the loan of the money.* If he does so, directly or indirectly, under whatever guise the charge in excess of lawful interest may be cloaked, the loan is usurious. *Richeson* v. *Wood,* 158 Va. 269, 163 S. E. 339, 82 A. L. R. 1189; *Roanoke Mtg. Co.* v. *Henritze,* 151 Va. 220, 144 S. E. 430. This is true even though the borrower may know that the money to be loaned him must be borrowed by the lender. But not every sum which a borrower agrees to pay to the lender in connection with the making of a loan to him is a charge *for the loan of the money.*

The majority of the cases which have passed upon the question hold that where the lender has to borrow the money loaned, he may, without being guilty of usury, contract with the borrower to make good to him the reasonable expenses actually incurred by him in good faith in procuring the money to be loaned, including any brokerage or commissions he may have to pay to get it. 21 A. L. R. note, 797, at p. 868. And one case (*Shirley* v. *Spencer,* 4 Gilman [9 Ill.] 583) is authority for the view that, if the lender is forced to pay an usurious rate of interest to get the money to be loaned by him to the borrower, he may contract with the borrower to make good to him the excess above lawful interest actually paid by him without rendering the loan made by him usurious.

However, such contracts are so readily used to cloak a usurious charge for the loan of the money that courts scrutinize them carefully. If the facts established by the evidence raise a serious doubt as to whether a part of the so-called charge for expenses has stuck to the lender's fingers, or as to whether the contract to pay expenses was, either in whole or in part, a device to procure more than the highest lawful rate of interest for the loan of the money, the doubt will be resolved against the lender and the transaction held usurious.

Also, though a lender is making a loan at the highest lawful rate of interest, he may contract to perform for the borrower for a consideration services of a

special nature, which, though collateral to the making or consummation of the loan, are not necessarily incident to the lending of the money. If such services are contracted for and performed in good faith, and not as a shift or device to cloak what is in fact a charge of more than lawful interest for the loan of the money, the agreement to pay therefor will not render the loan usurious. The single fact that the services are rendered in connection with a loan of money, or assist in the negotiation or consummation of a loan, is not alone sufficient to stamp the consideration the borrower agrees to pay therefor as a consideration given, in whole or in part, for the loan of the money and hence to render the loan usurious. That a lender is a party to the loan contract does not deprive him of the right to be compensated for extra-ordinary labors performed by him in good faith for the benefit of the borrower in completing the contract. Webb on Usury, sections 81-83; 21 A. L. R. note, 797, particularly pp. 802-807, 815, 818, 870, 871; 39 Cyc. p. 931; *Meyers* v. *Williams* (*Myers* v. *Roller*), 85 Va. 621, 8 S. E. 483; *Hopkins* v. *Baker's Adm'r*, 2 Pat. & H. 110; *Stein* v. *Swensen,* 46 Minn. 360, 49 N. W. 55, 24 Am. St. Rep. 234; *Douglass* v. *Boulevard Co.,* 91 Conn. 601, 100 Atl. 1067.

The mere fact that the amount of the charge for collateral services is larger than is usually charged for such services does not of itself constitute usury. It is at most only evidence of usury. But where the amount is very much larger than what is a reasonable charge for the services to be rendered, it is evidence of almost compelling force that the compensation contracted for was, in part at least, a consideration given for the loan of the money. 21 A. L. R. note, 797, at pp. 802, 803, 815; *Stein* v. *Swensen, supra; Douglass* v. *Boulevard Co., supra.*

Contracts for collateral services are in many instances even more readily used as a shift or contrivance to procure more than the lawful rate of interest for the loan of the money than are contracts purporting to provide for the payment of expenses of the lender. They are accordingly viewed by the courts with a correspond-

ingly more jealous eye. This is particularly true of a contract in which the lender agrees to loan money which he tells the borrower he will have to borrow from some third person, and also stipulates that the borrower will pay him for the time expended by him and the trouble to which he is put to get the money, and/or for the services rendered the borrower by him in procuring the money he lends.

Where the charge made bears a reasonable relation to the time expended and the trouble to which the lender is put to procure the money, the transaction is judged by much the same standard as a contract for the payment of expenses incurred by the lender. But a charge for the mere service rendered a borrower by borrowing from a third person money for the purpose of lending it to the borrower is so intimately related to the service the lender performs for the borrower by lending him the money, that it is difficult in most instances to dissociate the two services, or to draw any clear distinction between them.

There are some cases in which courts have held that though the charge made was not only to compensate the lender for the time and trouble expended in procuring the money, but also for the service rendered to the borrower in borrowing the money to be loaned to him, it did not, in the particular case under consideration, render the loan usurious. But the rule applicable to such cases which is to be deduced from the better considered cases is, we think, this: To escape the charge of usury it must be established by clear, cogent, and convincing evidence, which removes any serious doubt on the point, that the charge was made in good faith for such service and did not, either in whole or in part, constitute a consideration to the lender for making to the borrower a loan of the money. If it appears from the evidence that the compensation charge by the lender for the service performed by him for the borrower in borrowing the money was the inducement to the lender to make the

loan to the borrower, it is almost impossible to escape the conclusion that it was in its final analysis a consideration for the loan of the money. Any other rule in its practical application would nullify to a large extent the statutes relating to usury.

What has been said above has been said with reference to cases in which the person receiving the compensation in question is the lender of the money. We have not been discussing cases in which the person receiving the compensation was employed by the borrower as his agent or broker to procure a loan to be made to the borrower by a third person, or cases in which the contract between the borrower and the person receiving the compensation was *merely* for the sale of his credit to the borrower to enable him to procure a loan from a third person.

It is well settled that a borrower may employ an agent or broker to procure a loan for him from some third person, and, in the absence of any statutory restriction, pay him any compensation for such service that may be agreed upon between them without rendering the loan made by the third person usurious, provided the lender has no interest whatsoever in such payment, and the agent or broker no interest in the loan made by the third person. 21 A. L. R. note, 797, at p. 823 *et seq.,* and p. 830; *Keagy* v. *Trout,* 85 Va. 390, 7 S. E. 329.

Also, where he acts in good faith and not as a shift or contrivance to conceal an usurious loan made by him, a person may sell his credit to a borrower for a consideration, and to that end may endorse, guarantee or become surety for the payment of a loan made to the borrower by a third person at the highest lawful rate of interest without rendering either the contract for the sale of his credit or the loan made by the third party usurious.[10] *Keagy* v. *Trout,* 85 Va. 390, 397, 7 S. E. 329; *De-*

---

[10] It has also been held that this is true, though for convenience or to enable the borrower to borrow more readily upon the credit of the person selling his credit, the promise to pay takes the form of a negotiable note drawn by the person selling his credit and endorsed by the borrower. *Allen* v. *Newton,* 219 Mo. App. 74, 266 S. W. 327.

*Forest* v. *Strong,* 8 Conn. 513, 519; *Beckwith* v. *Windsor Mfg. Co.,* 14 Conn. 594; *Brown* v. *Harrison,* 17 Ala. 774; *Ketchum* v. *Barber,* 4 Hill (N. Y.) 225, affirmed 7 Hill (N. Y.) 444; *Perrine* v. *Hotchkiss,* 58 Barb. (N. Y.) 77, 87; *Kitchel* v. *Schenck,* 29 N. Y. 515; *Gannon* v. *Forgotston* (Super. Ct.) 34 N. Y. S. 34; *Gilbert* v. *Warren,* 56 App. Div. 289, 67 N. Y. S. 978; *Birdsall* v. *Wheeler,* 62 App. Div. 625, 71 N. Y. S. 67; *Grannis* v. *Temple,* 84 Misc. Rep. 415, 146 N. Y. S. 239.

It is also well settled that in determining whether a particular contract was a contract for the loan of money for an usurious consideration, or a legitimate brokerage contract or a legitimate contract for the sale of credit, the courts will disregard its form and look to its substance.

For instance, it has been held in a number of cases that, where the borrower has employed an agent or broker to procure a loan for him from some third person, and it *clearly* appears from the evidence that the loan was made in fact and in good faith, to the borrower by a third person, and not directly or indirectly by the agent or broker, the mere fact that the evidence of debt upon which the third person made the loan was taken in the name of the agent or broker and transferred by him to the lender, is not sufficient to stamp the loan with usury, if it also clearly appears that this was done merely for convenience in negotiating or consummating the loan. 21 A. L. R. note, pp. 797, 827; 53 A. L. R. note, p. 753; *Hughes* v. *Griswold,* 82 Ga. 299, 9 S. E. 1092; *Stansell* v. *Georgia Loan & Trust Co.,* 96 Ga. 227, 22 S. E. 898; *Hawley* v. *Howell,* 60 Iowa 79, 14 N. W. 199; *Title Guaranty & T. Co.* v. *Wheatfield,* 123 Md. 458, 91 Atl. 757; *Allen* v. *Newton,* 219 Mo. App. 74, 266 S. W. 327. It has also been held that under such circumstances the additional fact that pending the negotiation and consummation of the loan, the agent or broker advanced to the borrower the whole or a part of the proceeds of the loan from his own funds, is not of itself sufficient to stamp the transaction as being usurious. *Riley* v. *Olin,* 82 Ga. 312, 9 S. E. 1095; *Title*

*Guaranty & T. Co.* v. *Wheatfield, supra; Mallory* v. *Columbia Mtg. & T. Co.,* 150 Tenn. 219, 263 S. W. 68.

Despite the jealous eyes with which courts view what purport to be sales of credit, there are some cases in which the transaction in question has been held to be a sale of credit and not a loan, even though the person claiming to have sold his credit received the obligation of the borrower and in turn gave his obligation to the person from whom the money received by the borrower ultimately came. *Tobin* v. *Neuman* (Mo. App.) 271 S. W. 842; *Ricker* v. *Clark,* 54 Vt. 289; *More* v. *Howland* (1847), 4 Denio (N. Y.) 264; *Elwell* v. *Chamberlin* (1864), 31 N. Y. 611, 615; *Hutchinson* v. *Hosmer,* 2 Conn. 341. But there are few well considered cases in which the court has reached such a conclusion.[11] Those above cited seem to be rested upon the view that the evidence showed sufficiently clearly, cogently, and convincingly to require a finding, or at least support a finding by the jury, that the transaction which was contemplated by both parties was merely a sale of credit, and was given this form in good faith and merely for convenience.

 Where, however, as in the instant case, a person takes and holds as his own property the note of a borrower given for money which he claims to have procured for the borrower at his request from a third person, for the repayment of which to the third person he, and not the borrower, is obligated, there is, to say the least, a very strong *prima facie* presumption that the transaction was a loan of money; and there is a very strong *prima facie* presumption that the transaction here in question was a loan of money by Costt John to the defendants. But in addition to this, the testimony of

---

[11] See *Dunham* v. *Dey* (1816) 13 Johns. (N. Y.) 40; *Dunham* v. *Gould* (1819) 16 Johns. (N. Y.) 367, 8 Am. Dec. 323; *Fanning* v. *Dunham* (1821) 5 Johns. Ch. (N. Y.) 122, 9 Am. Dec. 283; *Dry Dock Bank* v. *Amer. L. Ins. & T. Co.* (1850) 3 N. Y. (3 Comstock) 344; *Elwell* v. *Chamberlin* (1864) 31 N. Y. 611; *Moore's Ex'r* v. *Vance,* 3 Dana (33 Ky.) 361.

Costt John and his other witnesses, we think, refutes the idea that the contract between Costt John and the defendants was that he should act as their agent or broker to procure for them a loan from a third person, or should merely sell them his credit to enable them to borrow from another.

It seems plain to us that the agreement was that Costt John would himself lend to the defendants money, the whole or a part of which he told them he would have to borrow from some third person; and that the charges here in question must be justified, if at all, on the ground that they were charges which could be legitimately made in connection with a loan from Costt John to the defendants.

The evidence lacks much, we think, of showing clearly, cogently and convincingly either that no part of the $750 "brokerage" which Costt John claims to have paid to the bank, his brother and his wife stuck to his own fingers or that the $1,000 fee which was to be paid to him was not in fact in part, at least, a consideration for the loan of the money.

To begin with, the fact that in addition to the $750 "brokerage" he claims to have paid to others, Costt John attempted to charge the defendants a five per cent "brokerage" on the $1,000 secured by the second deed of trust, which he does not claim to have borrowed from anyone, is strong evidence that he had the animus to make the defendants an usurious charge for the loan of this money.

When we turn to the evidence with reference to the amounts he claims to have borrowed from his brother and his wife, his testimony is far from satisfactory. His other testimony casts suspicion on the statement that he borrowed from his brother $4,000 and from his wife $3,000 and paid them five per cent "brokerage" on the sums loaned him; and there is no other evidence in the record which corroborates him on these points. He states categorically that he borrowed these sums, and attempts, without saying so, to leave the impression that the loans

made to him by his wife and brother were for a period of five years. Yet he says that he gave them no evidence of the debt. While he says he paid them five per cent "brokerage" he nowhere testifies as to what rate of interest he was to pay them, or that either of them required him to pay them a bonus, above lawful interest, for the loan of the money to him. In the case of his brother he seems to have borrowed the money, if at all, for his own general business purposes and not merely for the purpose of making this loan to the defendants; and in both the case of his wife and his brother his relationship with them throws a suspicion upon his good faith in having paid them five per cent "brokerage" or bonus, if he did so. Though the transaction with his wife and brother are in the light of his testimony suspicious, he did not take the deposition of either of them to substantiate his statements that he had borrowed these sums from them and had paid them a bonus or "brokerage" to make the loans to him.

As to the $1,000 fee which he claims they agreed to pay to him for his services in connection with the loan, the fee is so much larger than what is a reasonable compensation for his time and trouble in borrowing the money and disbursing it for the defendants, that in the light of the evidence we find it impossible to escape the conclusion that the fee paid him for borrowing the money to lend them was in reality the inducing cause of his agreeing to make a loan to them, and in a very real sense a consideration for the loan of the money by him to them.

For the reasons stated, we are of opinion that the loan made by Costt John to the defendants, was tainted with usury. This being true, he had forfeited the right to demand of the defendants the payment of the interest notes secured by the deed of trust, and the court erred in holding that there had been any default in the payment of certain of the interest notes secured by the deed of trust.

We are also of the opinion that the decree ap-

pealed from cannot be sustained on the theory that there had been a default in either the payment of taxes or the payment of insurance premiums. At the time this suit was instituted, March 27, 1931, there were no taxes due and payable which had not been paid by the defendants or by Costt John with money in his hands belonging to the defendants. The only insurance premium then due which had not been paid was the premium on a policy issued March 20, 1931, for $2,000 for the period of one year; and Costt John at that time had in his hands at least $82.93 which he had collected from the rents on this property from which this premium should have been paid.

It is true that when Costt John's deposition was taken on May 23, 1931, he introduced testimony to show that on April 14, 1931, the policies of insurance for sums aggregating $6,000 which had been issued on this property on September 4, 1930, had been cancelled; and three new policies for $2,000 each for a period of one year from April 14, 1931, had been issued, and that after crediting the return premium on the cancelled policies there then remained $72.96 of the premium on these new policies which remained unpaid. It is also true that when the deposition of George Chakales was taken on February 11, 1932, it was brought out on his cross-examination that the 1931 taxes had not at that time been paid, but he explained that this was so because of the fact that they had employed counsel to take steps to have their tax assessment reduced. It must have been on this testimony that the court based its findings that there had been a default in the payment of taxes and insurance premiums. However, the non-payment of the 1931 taxes and the premiums on the insurance policies issued after March 27, 1931, had not been made an issue by any pleading filed in the cause, and the complainants were not entitled upon the pleadings to have a decree of sale entered predicated upon the fact that taxes or insurance premiums which had fallen due after the institution of the suit had not been

paid. *Blizzard* v. *Salyer,* 125 Va. 604, 612, 100 S. E. 454; *Smith* v. *Lowther,* 35 W. Va. 300, 13 S. E. 999; 21 C. J., pp. 526, 548.

Neither the court below nor this court can base its decree on facts not alleged or put in issue by the pleadings, or safely grant relief except upon issue made by the pleadings and sustained by the evidence in the cause. *Blizzard* v. *Salyer, supra.*

The court did not make a specific finding upon the charge that there had been a breach of the covenants of the deed of trust with reference to the rents of the property. But upon an examination of the evidence on this point, we are of opinion that it establishes that at the time the suit was instituted there had been and was such conduct on the part of the defendants with reference to the rents of this property as constituted a breach of the covenants of the deed of trust and entitle Costt John to require the trustee to make sale thereof in accordance with the terms of the deed of trust. For this reason, we think that the court did not err in directing the trustee to proceed to make sale of the property in accordance with the provisions of the deed of trust, and in enjoining the defendants from interfering with the trustee in the performance of his duties. But the decree of the court should have contained a provision enjoining Costt John from negotiating the interest notes held by him and requiring him to deliver such notes to the trustee for cancellation before the property should be advertised for sale under the deed of trust.

The decree of the court will be modified by striking out the findings of the court "that there had been a default in the payment of certain interest notes secured under the deed of trust mentioned in these proceedings, as well as in the payment of taxes and insurance premiums," and inserting a finding that there has been a breach of the covenants of the deed of trust relating to the rental of the property and of the assignment of the rents made in the deed of trust to Costt John. It will further be modified

by the addition of a provision enjoining Costt John from negotiating the interest notes in the deed of trust mentioned, and a provision that the trustee shall not proceed to advertise the property for sale under the deed of trust and the decree of the court until Costt John shall have delivered up to him all the interest notes secured by the deed of trust for cancellation. As so modified, the decree of the court will be affirmed.

*Modified and affirmed.*

GREGORY, J., concurs in results.